# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
December 14, 2011 Session

## KATIE J. ROUNTREE v. JOSHUA ROUNTREE

**Direct Appeal from the Chancery Court for Maury County**
**No. 09-643      Stella H. Hargrove, Judge**

---

**No. M2011-01283-COA-R3-CV - Filed February 1, 2012**

---

This is a divorce case involving issues related to the permanent parenting plan and the division of marital property. The trial court adopted Mother's proposed permanent parenting plan, which provided that the child would attend preschool, against Father's wishes, even though prior to trial Father had been the primary caregiver of the child while Mother worked. The trial court also adopted Mother's proposed division of marital property. We conclude that the trial court erred in finding that Father's desire to care for the child during the day was based on a self-serving motive. Accordingly, we vacate the parenting plan and remand for the establishment of a new permanent parenting plan. We further conclude that Mother was improperly assigned her attorney fees as a marital debt, and we reverse that award. In addition, we reverse portions of the trial court's findings regarding the marital property, but affirm the overall division as equitable. Affirmed in part, reversed in part, vacated in part, and remanded.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Reversed in Part; and Vacated in Part; and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Mart G. Fendley, Clarksville, Tennessee, for the appellant, Joshua Rountree.

Wesley Mack Bryant, Columbia, Tennessee, for the appellee, Katie J. Rountree.

## OPINION

## I. Background

Plaintiff/Appellee Katie J. Rountree and Defendant/Appellant Joshua Rountree were

married on June 26, 2001. Mr. Rountree was injured in an accident prior to the parties' marriage and is confined to a wheelchair. Because of the pain associated with his injuries, Mr. Rountree was prescribed narcotics, including Oxycodone, and later, Methadone.

The parties' only child, a daughter, was born on June 16, 2008, while the parties were living in Texas. After the birth of the child, Ms. Rountree stayed home with the child for eight weeks and then returned to work as a paralegal. Prior to the birth of the child, Mr. Rountree worked as a legal assistant in his brother's law office; however his brother closed the office to seek a new profession and Mr. Rountree did not seek further employment. Instead, the parties agreed that Mr. Rountree would serve as the primary caregiver of the child in order to allow Ms. Rountree to work.

At some point, Ms. Rountree informed Mr. Rountree that she wanted to return to Tennessee, where both her parents and Mr. Rountree's parents resided. Mr. Rountree agreed and the parties attempted to sell their home. In April of 2009, while the home was still on the market in Texas, Ms. Rountree moved back to Tennessee with the child to pursue a career opportunity. Mr. Rountree stayed behind in Texas for the purpose of selling the parties' home. While in Tennessee, Ms. Rountree and the child lived with Ms. Rountree's parents, who cared for the child during the day after Ms. Rountree took a full time job with a law office. Although the home in Texas sold in July of 2009, Mr. Rountree remained in Texas until September because he did not want to stay in Ms. Rountree's parents' home, which was not wheelchair accessible.

After Mr. Rountree moved to Tennessee, the parties moved into their own apartment. Per the parties' previous arrangement, Mr. Rountree returned to taking primary responsibility for the child during the day while Ms. Rountree worked. After Ms. Rountree came home from work, she would care for the child until bedtime, and Mr. Rountree would care for the child throughout the night.

This arrangement worked for approximately one month; however, on October 20, 2009, an incident occurred that caused Ms. Rountree to question Mr. Rountree's ability to care for the child. This incident occurred after a weekend where Mr. Rountree returned to Texas to refill his Methadone prescription. According to Ms. Rountree, Mr. Rountree became panicked because no local physicians would provide him a Methadone prescription. In order to obtain Methadone, Mr. Rountree traveled back to Texas on a weekend when Ms. Rountree was scheduled to undergo a cancer screening. The cancer screening made Ms. Routnree ill and rendered her unable to care for herself for a number of days.[1] Following Mr.

---

[1]Ms. Rountree is a survivor of thyroid cancer. In order to determine if the cancer has returned, Ms.

(continued...)

Rountree's return to Tennessee and the conclusion of the cancer screening, Ms. Rountree returned to work. However, when Ms. Rountree came home from work for lunch, she observed that the child had not been fed or changed and that Mr. Rountree appeared to have over-medicated himself. Ms. Rountree refused to leave the child with him for the remainder of the day. When Ms. Rountree came home for lunch the next day, she noticed the same issues. The parties had an argument, wherein Mr. Rountree intimated that he might take the child and return to Texas. After this incident, Ms. Rountree moved out of the apartment she shared with Mr. Rountree and moved in with her parents.

Based on this incident, Ms. Rountree filed for an *ex parte* order of protection on October 22, 2009, asking that Mr. Rountree be restrained from "taking, interfering with or otherwise depriving Petitioner from exercising custody and control of the Parties' minor daughter." The order of protection was granted on the same day, with a hearing scheduled for October 26, 2009. According to the record, no hearing was ever held.

On January 28, 2010, Ms. Rountree filed a complaint for divorce, alleging that Mr. Rountree was guilty of drug or alcohol abuse and inappropriate marital conduct. The complaint asserts that Mr. Rountree "is an able bodied person capable of contributing to the financial support of the minor child of the Parties," and asks that Ms. Rountree be named primary residential parent of the child. Accordingly, Ms. Rountree sought both *pendente lite* and permanent child support.

On the same day as the filing of the complaint, the record contains an agreed order scheduling Ms. Rountree's motion for *pendente lite* support and Mr. Rountree's motion to set visitation for hearing. Neither of these motions is contained in the record. Interestingly, the agreed order also states that the cause was heard on January 27, 2010 although no order was subsequently entered on either motion.

The parties entered into another agreed order on April 5, 2010, wherein Mr. Rountree agreed to be restrained from "taking, interfering with or otherwise depriving Petitioner from exercising custody and control of the Parties' minor daughter." However, the agreed order further states that:

---

[1](...continued)
Rountree must submit to annual tests wherein she takes a radiation pill. In the days after taking the pill, Ms. Rountree must be quarantined from her child and must have someone prepare her meals for her as she is not allowed in food preparation areas. According to Ms. Rountree, the child was to be sent to her parents during the day while Mr. Rountree was to care for Ms. Rountree. At night, the roles would switch and Mr. Rountree would care for the child at night, while Ms. Rountree went to her parents'; however, because of Mr. Rountree's unexpected trip, Ms. Rountree was forced to care for herself, including preparing her own meals, and the child stayed with Ms. Rountree's parents.

The Parties are working out an agreement concerning the times, duration, and supervising agent for the Father to exercise in this manner. If the Parties cannot reach an agreement, the Father may move this Honorable Court to decide this issue. Father agrees to continue counseling and pain management with a local (Tennessee) pain management specialist.

According to later testimony, the parties eventually agreed to allow Mr. Rountree to spend parenting time with the child, provided that the visitation was supervised by Ms. Rountree's parents.

On April 9, 2010, Mr. Rountree filed an answer to the petition for the order of protection, and an answer and counter-complaint to the complaint for divorce, admitting irreconcilable differences and denying all other material allegations. In his counter-complaint, Mr. Rountree sought to be named primary residential parent and sought both spousal and child support. On the same day, Mr. Rountree also filed a motion to set a temporary parenting schedule.

The parties appear to have reached another informal agreement in July of 2010 regarding parenting time. This agreement is not memorialized by an order of the court. According to later testimony of the parties, the agreement provided that Mr. Rountree would care for the child on weekdays while Ms. Rountree was at work. Ms. Rountree cared for the child at night and on the weekends. Although the parties were apparently able to come to this agreement without court intervention, later mediation, on October 26, 2010, proved unsuccessful.

A trial was held on November 24, 2010. During this trial, Ms. Rountree testified that she had become concerned by Mr. Rountree's drug use, which she said prompted her to leave Mr. Rountree and move in with her parents. Ms. Rountree admitted, however, that Mr. Rountree's drug usage was under control since the separation and that she no longer questioned Mr. Rountree's ability to care for the child. Ms. Rountree testified that she works approximately forty hours per week at a law firm . Even though she acknowledged that Mr. Rountree resumed caring for the child while she was at work prior to the trial, Ms. Rountree testified that she wants the child to attend preschool when she turns three years old. Ms. Rountree explained that the child needs the socialization and education that preschool can provide. Ms. Rountree also submitted a parenting plan that would allow Mr. Rountree to care for the child during the day until she turns three, at which time she would be enrolled in a preschool. The proposed parenting plan further provides that major decisions regarding education, medical issues, and religion would be made jointly by both parents.

In her testimony, Ms. Rountree also detailed the marital assets, including the cars and

retirement accounts, and the debts of the parties, including various medical expenses. Ms. Rountree testified that the child had been receiving social security benefits since the separation. In addition, the child had been awarded a considerable sum for benefits that she should have been receiving since her birth. Ms. Rountree testified that she used that sum to pay off certain debts of the parties, including a $500.00 AT&T bill. In addition, Ms. Rountree testified that, after the sale of the parties' Texas home, the parties received approximately $10,000 in profit. Ms. Rountree testified that she was never aware of what happened to that money, but that it had been put into Mr. Rountree's savings account, over which he maintained exclusive control.

Mr. Rountree, on the other hand, testified that he considers himself the primary caregiver of the child because, even when the child was primarily with Ms. Rountree, Ms. Rountree's parents cared for the child during the day. Mr. Rountree testified that he would like to continue keeping the child during the day because he was concerned that a preschool was really nothing more than a daycare and that "there's nothing she is going to learn in preschool that I haven't already taught her, or will teach her." Mr. Rountree also testified that he would like to spend more time with the child on the weekends, to take her to places like church, although regarding leaving her in the nursery at church, he stated "I don't like leaving her with other people." Mr. Rountree was also concerned about the quality of education where Ms. Rountree lives and testified that he hopes that he and Ms. Rountree would be able to come to an agreement to finance a private school education. Mr. Rountree testified that the child is extremely bright, knows the alphabet, can count unassisted to twenty, and can perform simple addition and subtraction.

Mr. Rountree explained that his liabilities each month exceed his assets. One reason his monthly bills are so high is due to his apartment. Mr. Rountree remained in the apartment the parties rented during the separation because the parties had signed a one-year lease. However, when the lease expired, that he was unable to find suitable wheelchair accessible housing and had to sign another year's lease for the three bedroom apartment. Mr. Rountree further testified that the $10,000.00 profit made on the Texas home was used by the parties to pay marital expenses and moving costs.

At the conclusion of the proof, the trial court declared the parties divorced and ordered that they continue with the agreed parenting plan they were currently using. The trial court filed its Memorandum Opinion on December 7, 2010, naming Ms. Rountree primary residential parent and incorporating Ms. Rountree's parenting plan verbatim, with the exception that, instead of giving the parties joint decision making authority with regard to educational and extracurricular decisions, the court found that Ms. Rountree should have sole decision making authority on those issues. The parenting plan provided that Mr. Rountree would have visitation with the child Monday through Friday while Ms. Rountree

was at work and overnight visitation on Wednesday nights. The parenting plan further provided that, once the child turned three and was enrolled in preschool, Mr. Rountree's visitation would be Friday evening through Sunday morning every other weekend and from Wednesday morning until Thursday when Ms. Rountree leaves work.[2] In making the decision to allow Ms. Rountree to place the child in preschool rather than allow Mr. Rountree to continue caring for the child, the court stated that:

> The Court is concerned that Father is not objective in determining the best interest of [the child], that he has a great need for the company of his child through the day due to his inability to be gainfully employed and that Father dreads separation from her. He testified as follows: "I don't like leaving her with other people." "There's nothing she'll learn at school that I can't teach her." "She'll be safe with me."

The court also adopted Ms. Rountree's marital property division, which, among other things, allocated the allegedly missing $10,000.00 profit on the Texas home to Mr. Rountree and assigned Ms. Rountree's attorney fees in the amount of $6,080.00 to her as a marital debt. The trial court further found that, in considering Mr. Rountree's prayer for rehabilitative alimony, he does have a need for alimony; however, because Ms. Rountree's expenses exceed her income by over $400.00 per month, the court found that Ms. Rountree did not have the ability to pay. Accordingly, the trial court denied Mr. Rountree's request for alimony. On December 21, 2010 the trial court filed a Final Decree of Divorce expressly incorporating the Memorandum Opinion.

On January 19, 2011, Mr. Rountree, having retained a new attorney, filed a motion under Rule 59 of the Tennessee Rules of Civil Procedure, to alter or amend the judgment or, in the alternative, for a new trial. In the motion, Mr. Rountree asserted that there was no proof in the record to support the trial court's conclusion that preschool was in the best interest of the child, and that there was no evidence to suggest that Mr. Rountree's prior narcotic use or current physical condition in any way affected his present ability to care for the child. A hearing was held on March 25, 2011. During the hearing, the trial court emphasized that its decision to allow the child to attend daycare was not based on any finding that Mr. Rountree's past narcotic use negatively affected his ability to care for the child, but was due to Mr. Rountree's desire to keep the child to the exclusion of "everybody else in the world." The trial court stated:

> My main concern with Mr. Rountree was his need for this child to be with him in the face of everybody else in the world and his feeling like she would be

---

[2] During the pendency of this appeal, the child turned three years old and was enrolled in a preschool.

better off with him than anybody else, including day school - preschool. That's what really turned the corner for me with the father. It wasn't his medication. . . . I did not deny him rights to the child based upon narcotics. . . . I was concerned about isolating this child from the world to the exclusion of everybody under him. And I thought that was not a good idea for this child.

On May 3, 2011, the court denied the Rule 59 motion, noting that Mr. Rountree's issues were best determined by an appeal to this Court. Indeed, Mr. Rountree filed his notice of appeal on May 19, 2011. On August 11, 2011, the parties participated in a conference call over an alleged ambiguity regarding the parenting plan. Ms. Rountree asserted that the plan's provision allowing Mr. Rountree visitation from Wednesday morning until Thursday afternoon conflicted with the court's order that Ms. Rountree would have sole decision-making authority over the child's educational decisions, including the decision to put her into preschool. The trial court, by order of August 12, 2011, agreed with Ms. Rountree and ordered that Mr. Rountree would have visitation every other Wednesday from when the child left school, until the child went to school on Thursday morning. The trial judge did not modify Mr. Rountree's weekend visitation. On August 29, 2011, Mr. Rountree filed a motion to supplement the record on appeal to include the August 12, 2011 order. Ms. Rountree filed a motion in opposition on September 2, 2011. This Court granted the motion to supplement the record by order of September 7, 2011, expressly reserving judgment regarding relevance pending oral argument and submission of the case for a decision.

## II. Issues Presented

Mr. Rountree raises the following issues for review, which we rephrase:

1. Whether the trial court erred in fashioning the permanent parenting plan?

2. Whether the trial court erred in classifying and dividing the marital property?

3. Whether the trial court erred in entering the temporary order modifying the permanent parenting plan?

## III. Analysis

## A. Parenting Plan

Because this case was tried by the court sitting without a jury, we review the case *de*

*novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Tenn. R. App. P. 13(d). In applying the *de novo* standard, we are mindful that "[t]rial courts are vested with wide discretion in matters of child custody' and that 'the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." ***Hyde v. Amanda Bradley***, No. M2009-02117-COA-R3-JV, 2010 WL 4024905, at \*3 (Tenn. Ct. App. Oct. 12, 2010) (citing ***Johnson v. Johnson***, 169 S.W.3d 640, 645 (Tenn. Ct. App. 2004)). Because "[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during . . . proceedings," appellate courts "are reluctant to second-guess a trial court's decisions." ***Hyde***, 2010 WL 4024905, at \*3 (citing ***Johnson***, 169 S.W.3d at 645).

Mr. Rountree first takes issue with the trial court's adoption of Ms. Rountree's parenting plan, as well as the court's modification to provide that only Ms. Rountree may make educational and extracurricular decisions. Mr. Rountree argues that nothing in the record supports the trial court's determination that a parenting plan allowing Mr. Rountree to continue caring for the child during the day was not in the child's best interest. To support his argument, Mr. Rountree argues that the record does not support the trial court's finding that Mr. Rountree "has a great need for the company of his child through the day due to his inability to be gainfully employed and that Father dreads separation from her." From the record, we agree.

In fashioning parenting plans, Tennessee Code Annotated Section 36-6-401 advises courts that:

> The general assembly recognizes the fundamental importance of the parent-child relationship to the welfare of the child, and the relationship between the child and each parent should be fostered unless inconsistent with the child's best interests. The best interests of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care.
>
> \*   \*   \*
>
> Most children do best when they receive the emotional and financial support of both parents. . . .

Recently our legislature amended the child custody statute to include a statement emphasizing this policy. *See* 2011 Pub. Acts, ch. 433, §1 (effective June 6, 2011). Tennessee Code Annotated Section 36-6-106(a) now provides, in pertinent part:

In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in subdivisions (a)(1)-(10), the location of the residences of the parents, the child's need for stability and all other relevant factors.

Accordingly, Tennessee courts must now fashion custody arrangements so as to give each parent the maximum amount of time possible with the child, in accordance with the child's best interests.[3]

In determining the child's residential schedule, the court must consider the factors set forth in Tennessee Code Annotated Section 36-6-404(b).[4] Having reviewed the evidence, we conclude that the factors that are relevant to this case concern which parent was the primary caregiver of the child, the emotional and developmental needs of the child, the child's interactions with the child's surroundings and significant activities, and the importance of continuity in the child's life. Tenn. Code. Ann. §36-6404(b)(6), (8), (10), & (11).

Mr. Rountree first argues that the trial court erred in finding that both parents were the child's primary caregivers . Mr. Rountree points out that, even when Ms. Rountree had custody of the child after the separation, Ms. Rountree's parents primarily cared for the child while Ms. Rountree was at work. The testimony of the parties shows that both parents intended to share caregiver responsibilities and that each parent was the caregiver of the

---

[3] The current version of Tennessee Code Section 36-6-106 went into effect on June 6, 2011. *See* 2011 Pub. Acts, ch. 433, §1, (effective June 6, 2011). The trial in this case occurred on November 24, 2010. While the new language does not specifically apply to this case, the amendment reflects a public policy in favor of allowing the child ample time with both parents, which is a paramount consideration in all Tennessee parenting plan decisions.

[4] The only issue on appeal regarding the visitation and custody, according to Mr. Rountree is the question of "should the parenting plan be modified?" Mr. Rountree's brief focuses on the parenting plan ordered by the court, specifically the portion that requires the child be enrolled in daycare throughout the day. In fact, Mr. Rountree asks only that this Court enter a new parenting plan giving each party equal time with the child and providing that Mr. Rountree will be responsible for the child during the day until enrolled in kindergarten. Mr. Rountree's only mention of the court's decision to name Ms. Rountree primary residential parent are the statements: "It is prayed that this Court will recognize . . . that this [factor requiring the court to consider the parent's past performance of caregiving responsibilities] is perhaps the most critical test of which Parent should be primary;" and "if Father is named primary, he [should] receive[] the additional social security benefit for the child." We may consider an issue waived where it is argued in the brief but not designated as an issue. *Childress v. Union Realty Co.*, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002). Therefore we will only consider whether the court erred in fashioning the permanent parenting plan.

child for approximately half her life (fourteen months for Mr. Rountree and sixteen months for Ms. Rountree). Accordingly, the evidence does not preponderate against the trial court's finding that both parents were the child's primary caregivers.

The largest point of contention between the parties is what course of action best provides for the emotional, developmental, and social needs of the child. Ms. Rountree testified that the child would benefit from the socialization of a preschool environment as she is an only child and has had little opportunity to socialize with children her own age. In contrast, Mr. Rountree hoped to care for and educate the child at home until she went to kindergarten. The trial court found that Mr. Rountree "dreads separation from the child" and characterized Mr. Rountree's desire to care for the child during the day as self-serving.

We note that the trial court made no adverse credibility findings against Mr. Rountree. The only evidence in the record regarding Mr. Rountree's desire to keep the child during the day are the following statements made by Mr. Rountree:

> I don't like to leave her with other people, but I'm glad [that she goes to church].

> * * *

> That was never the plan at all. Neither one of us wanted to give her to anybody else that we didn't have to until we had to. And there's nothing she is going to learn in preschool that I haven't already taught her, or will teach her. She gets to see kids at church, and the Halloween party we went to, and all the stuff they take her to. She socializes fine.

> * * *

> And so yeah there's lots of things that you could do to shelter her from maybe being around some bad influences earlier.

> * * *

> Well mainly, . . . I really haven't heard of or seen a preschool program that isn't anything much more than a daycare, and that's no good. I mean, that's just —why would she go there for daycare when I can take care of her, and make sure that she's doing the things that she needs to be doing, or learning, or reading, or playing, or whatever? And I know she's safe when she's with me.

From these statements, the trial court imputes to Mr. Rountree a self-serving motive for keeping the child out of preschool, specifically that he needs the companionship of the child due to what the court deems his "inability to be gainfully employed."

From our review of the record, there is no evidence to support the trial court's finding that Mr. Rountree's motive in keeping the child from preschool is due to his need for the companionship of the child. Considering his testimony as a whole, Mr. Rountree appears to be a loving, though perhaps overprotective, father. The evidence is undisputed that the child is exceptionally intelligent for her age and Mr. Rountree's testimony shows that he actively works to provide the child with stimulation. Mr. Rountree testified that the child knows her alphabet and numbers extremely well for a child of her age, which Ms. Rountree did not dispute. From our review of the record, Mr. Rountree's desire to care for the child himself stems from his belief that the child's best interests are served by continuing the education she receives with him rather than placing her in a preschool.

Ms. Rountree's only explanation for her desire that the child attend preschool states:

> She's an only child., and so I think she needs to be around other kids her age on a regular basis for socialization. She needs to start learning just the skills to get into kindergarten like colors and some numbers, and the other things that they teach in the preschool.

Other than this testimony, Ms. Rountree submitted no evidence showing how preschool would be in the best interests of the child, nor did Ms. Rountree introduce any evidence of the proposed preschool. Accordingly, there is no evidence to rebut Mr. Rountree's assertion that he can educate the child as well as a preschool. Considering Ms. Rountree's assertion that the child lacks socialization, the evidence shows that, while the child is not provided with a multitude of playmates, she does interact with other children at parties, church, and the park.

From our review of the evidence, the record contains no evidence that Mr. Rountree "dreads separation from the child" or that Mr. Rountree's motive in keeping the child from preschool is in any way due to Mr. Rountree's "inability to be gainfully employed." Indeed, Mr. Rountree was employed prior to the birth of the parties' child and there is no evidence that he does not have the ability to be employed in the future.[5] Furthermore, prior to trial, Mr. Rountree had been caring for the child during the day for nearly five months without

---

[5] Mr. Rountree testified that he could be employed, earning up to a certain limit, without losing his disability benefits. Because child support in this case is paid through the disability benefits, there was no issue of Mr. Rountree being unemployed or underemployed.

incident. Because continuity is important, especially in the life of a young child, this consideration weighs in favor of Mr. Rountree's desire to continue caring for the child during the day. Accordingly, the evidence in the record simply does not support the trial court's conclusion that Mr. Rountree's motive in keeping the child out of preschool was to assuage his own separation anxiety due to his inability to be gainfully employed.

The issue of whether a child should be enrolled in preschool "is largely a matter of fact finding, and requires a determination of what is in the best interest of this child." *Curry v. Curry*, No. M2007-02446-COA-R3-CV, 2008 WL 4426895, at *15 (Tenn. Ct. App. Sept. 18, 2008). We recognize that "[i]t is not the function of appellate courts to tweak a visitation order in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). The Tennessee Supreme Court has stated that in reviewing parenting plans, the appellate court should not reverse unless "the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Id.* In this case, however, the trial court based its ruling on facts unsupported by the record. As discussed above, there was no basis for the trial court to restrict Mr. Rountree's parenting time so as to accommodate preschool, especially given the express legislative preference that parents receive the maximum time possible with their children. *See* Tenn. Code Ann. §36-6-106(a); *see also* **Hogue v. Hogue**, 147 S.W.3d 245 (Tenn. App. Ct. 2004) (noting that the "right of the non-custodial parent to reasonable visitation is clearly favored").

From our review of the trial court's order, the decision to adopt Ms. Rountree's proposed permanent parenting plan was based almost exclusively on the trial court's unsupported conclusion that Mr. Rountree has a self-serving motive for his desire to keep the child out of preschool. This Court has previously discussed the duty of the court in fashioning a parenting plan, stating:

> Courts must strive to devise parenting plans that promote the development of the children's relationship with both parents and interfere as little as possible with post-divorce family decision-making. *Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1996); *Taylor v. Taylor*, 849 S.W.2d 319, 331–32 (Tenn. 1993). The needs of the children are paramount; the desires of the parents are secondary. *Lentz v. Lentz*, 717 S.W.2d 876, 877 (Tenn. 1986). Parenting plans should never be used to punish or reward the parents for their human frailties or past mis-steps, *Earls v. Earls*, 42 S.W.3d 877, 885 (Tenn. Ct. App. 2000); *Turner v. Turner*, 919 S.W.2d 340, 346 (Tenn. Ct. App. 1995); *Long v. Long*, 488 S.W.2d 729, 733 (Tenn. Ct. App.1972), but rather they should be used to advance the children's best interests by placing them in an environment that best serves their physical and emotional needs. *Luke v.*

*Luke*, 651 S.W.2d 219, 221 (Tenn. 1983).

***Shofner v. Shofner***, 181 S.W.3d 703 (Tenn. Ct. App. 2004) (internal citations omitted). Despite the requirement that trial court focus on the best interests of the child rather than the frailties of the parent, the trial court's decision to adopt Ms. Rountree's parenting plan focuses almost entirely on Mr. Rountree's alleged need for the companionship of the child, rather than the issue of whether the child's best interests are furthered by enrolling her in preschool.[6] In fact, the court never explains how the decision to enroll the child in preschool is in the best interests of the child. Therefore, we conclude that the trial court erred in adopting Ms. Rountree's proposed permanent parenting plan. Although we recognize that this Court has the power to fashion a new permanent parenting plan based on the record in this case, we conclude that a remand for the trial court to determine a new parenting plan is in the best interests of the child. We note that these parties have been able to come to an informal agreement regarding parenting time prior to the trial in this case. It is our hope that the parties will again work together and with the court to ensure that the child enjoys maximum parenting time with both parents, as well as socialization with other children. Accordingly, we vacate the trial court's entry of the permanent parenting plan and remand with instructions to fashion a new plan that is based on the evidence of what is in the child's best interests. Because Mr. Rountree also takes issue with the trial court's decision to vest educational and extracurricular decision-making authority solely with Ms. Rountree, the trial court, on remand, should reconsider this issue in fashioning a new permanent parenting plan. Based on this decision, any issue regarding the temporary order modifying the trial court's prior parenting plan is pretermitted.

## B. Division of Property

Mr. Rountree next argues that the trial court erred in its classification and division of marital property.[7] The division of marital property, including its classification and valuation

---

[6] The trial court, in its comparative fitness analysis, determined that both parties had strong emotional connections to the child, that both had been the primary caregiver of the child, and that both had stable lives. These issues, along with the issue of Mr. Rountree's motive in keeping the child from preschool, were the only issues specifically discussed in the trial court's Memorandum Opinion. Therefore we must conclude that the issue of Mr. Rountree's alleged need for the companionship of the child was the determinative issue in adopting Ms. Rountree's proposed permanent parenting plan.

[7] We note that Mr. Rountree's initial brief does not contain a chart detailing the division of marital property. As Ms. Rountree's brief points out, Tennessee Rules of the Appellate Court Rule 7 requires that in all cases where a party takes issue with the classification and division of marital property, the party must include in its brief a chart displaying the property values proposed by both parties, the value assigned by the trial court, and the party to whom the trial court awarded the property. Tenn. Ct. App. R. 7. It is well settled

(continued...)

are findings of fact. ***Woodward v. Woodward****,* 240 S.W.3d 825, 828 (Tenn. Ct. App. 2007). Trial courts have "wide latitude in fashioning an equitable division of marital property." ***Altman v. Altman****,* 181 S.W.3d 676, 683 (Tenn. Ct. App. 2005). Accordingly, the trial court's decisions regarding classification, valuation and division of property are reviewed *de novo* with a presumption of correctness unless the evidence preponderates otherwise. ***Farrar v. Farrar****,* 553 S.W.2d 741, 743 (Tenn. 1977).

Mr. Rountree argues that, because he is disabled, is unable to obtain substantial gainful employment and has a low relative earning capacity, he should have been given a more favorable marital property division. Trial court's are directed to consider a multitude of factors in the division of marital property, including the earning capacity of the parties, the relative age, education, and physical health of the parties, and the social security benefits available to either spouse.[8] Tenn. Code Ann. §36-4-121. Mr. Rountree specifically asks that Ms. Rountree be ordered to pay all credit cards, including two Capital One accounts, a Bank of America Account, and a Care Credit Account. While we have determined that the trial court mis-classified and miscalculated some assets and debts, we conclude that the overall property division is not inequitable.

We first conclude that the trial court erred in assigning to Ms. Rountree her $6,080.00 in attorney fees as marital debt. Attorney fees incurred by each party are not marital debt. ***Hoover v. Hoover****,* No. 01A01-9706 -CV-00245, 1998 WL 97279, *3 (Tenn. Ct. App. March 6, 1998). If the trial court believes that an award of fees is justified after considering the relevant factors provided by Tennessee Code Annotated Section 36-5-101(d)(1) and the parties' ability to pay, then a separate award may be made. ***Id.*** We note, however, that, while both Ms. Rountree and Mr. Rountree requested attorney fees in their pleadings, no affidavits were filed to support their claims. Issues may be waived on appeal by the failure to present them at trial. *See **Waters v. Farr***, 291 S.W.3d 873, 918 (Tenn. 2009). From our review of

---

[7](...continued)
that "where an appellant fails to comply with this rule, that appellant waives all such issues relating to the rule's requirements." ***Harden v. Harden***, No. M2009-01302-COA-R3-CV, 2010 WL 2612688, at *8 (Tenn. Ct. App. June 30, 2010). In response to Ms. Rountree's brief, Mr. Rountree included a chart, with appropriate citation to the record, in his reply brief. Although we point out that Mr. Rountree does not strictly comply with Rule 7 by including the chart in only his reply brief, this Court has previously held that it may proceed with review of a marital property division for good cause under Tennessee Court of Appeals Rule 1(b). ***Harden***, 2010 WL 2612688, at *8. Given Mr. Rountree's compliance with Rule 7 in his reply brief, we will proceed to the merits of his argument.

[8] Mr. Rountree's only income is from social security benefits. In addition, as the primary residential parent, Ms. Rountree directly receives a portion of Mr. Rountree's social security benefits that are allocated to the child, which constitutes Mr. Rountree's entire child support obligation.

-14-

the record, we find no stipulation between the parties providing that the issue of attorney fees is to be decided after the resolution of the other actions in this case. *See Seals v. Life Investors Ins. Co. of America*, No. M2002-01753-COA-R3-CV, 2003 WL 23093844, at *4 (Tenn. Ct. App. Dec. 30, 2003) (noting that the issue of attorney fees was not waived by the party's failure to submit an affidavit of fees during trial only because the parties "stipulated the proof of attorney's fees could be submitted by affidavit after resolution of the [substantive] issue"). Therefore, we conclude that both parties' requests for attorney fees are waived. *See also Lyons v. State*, 2011 WL 3630330 (Tenn. Crim. App. Aug. 18, 2011) (quoting *Brimmer v. State*, 29 S.W.3d 497, 530 (Tenn. Crim. App. 1998) (noting that an issue is waived "because of a failure to present proof")).

In addition, Ms. Rountree's chart, which was adopted *in toto* by the trial court, contains a marital debt of $500.00 for an AT&T bill.[9] However, when asked if she had "already paid that off" prior to trial, Ms. Rountree replied that she had. Accordingly, the evidence preponderates against the trial court's finding that the AT&T bill was appropriately assigned as a marital debt. Correcting these errors, the marital debt properly assigned to Ms. Rountree was only $10,667.41, in contrast to the $20,143.67 assigned to Mr. Rountree.

In the marital property chart attached to Mr. Rountree's reply brief, Mr. Rountree also includes a number of debts that were not considered by the trial court in making the property division. From our review of the record, Ms. Rountree objected to the introduction of the documents because they had not been produced in discovery. Due to Mr. Rountree's failure to provide the documents in discovery, the trial court ruled that she would not consider the debts. The Tennessee Supreme Court in *Otis v. Cambridge Mutual Fire Insurance Co.*, 850 S.W.2d 439 (Tenn. 1992), outlined the appellate review of evidentiary rulings:

> In Tennessee admissibility of evidence is within the sound discretion of the trial judge. When arriving at a determination to admit or exclude even that evidence which is considered relevant trial courts are generally accorded a wide degree of latitude and will only be overturned on appeal where there is a showing of abuse of discretion.

*Id.* at 442. Nothing in the record leads us to conclude that the trial court abused its discretion in refusing to consider these debts. In addition, Mr. Rountree does not argue that the trial

[9] Mr. Rountree's brief does not specifically find error with the inclusion of the AT&T bill, but does argue that the trial court's marital property division, based on Ms. Rountree's chart, is inequitable. While generally issues not presented are waived, we conclude that the interests of justice allow us to consider the AT&T bill, given Mr. Rountree's general argument regarding the marital property division. *See* Tenn. R. App. P. 2.

court erred in not considering the debts in the argument section of his appellate brief, nor does he cite any authority to show the that the trial court abused its discretion. The failure "to cite to any authority or to construct an argument regarding [a] position on appeal" constitutes a waiver of the issue on appeal. ***Newcomb v. Kohler Co.***, 222 S.W.3d 368, 401 (Tenn. Ct. App.2006); *see also* ***Bean v. Bean***, 40 S.W.3d 52, 55–56 (Tenn. Ct. App. 2000) ("Courts have routinely held that the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) constitutes a waiver of the issue."). Accordingly, this issue is waived.

In order to determine if this division is equitable, we must also consider the marital assets assigned to each party. Mr. Rountree argues that the trial court erred in not including in the property awarded to Ms. Rountree a $2,000.00 savings account. From the record, it appears that Ms. Rountree did testify that she has $2,000.00 in a savings account; therefore, the evidence preponderates against the trial court's decision to disregard this account in the division of marital property. Accordingly, Ms. Rountree's asset award is increased to $11,285.77.

Mr. Rountree also takes issue with the trial court's award of $10,547.29 to him as profit from the marital home. According to Ms. Rountree this money was deposited in Mr. Rountree's savings account and she did not know what became of the money. However, Mr. Rountree testified that he used the money for living and moving expenses and that he no longer had the money. Again we note that the trial court made no adverse credibility findings against Mr. Rountree. Based on the testimony that Ms. Rountree was unaware of what happened to the money and Mr. Rountree's explanation of how the money was used, we find that the evidence preponderates against the trial court's finding that Mr. Rountree retained the property. Therefore, this amount should not have been awarded in the marital property division. Accordingly, the corrected amount of assets awarded to Mr. Rountree total $22,760.00.

Considering the amount of assets and liabilities properly awarded to each party in the divorce, Mr. Rountree receives a net gain of $2,616.33. Based on a miscalculation in Mr. Rountree's brief he asserts that Ms. Rountree's net gain would total $9,306.77,[10] which he

---

[10] In making this miscalculation in his brief, Mr. Rountree relies on the division of property chart submitted by Ms. Rountree and adopted by the court, which itself contains a miscalculation. The chart states that even taking into account the debt for the attorney fees and the AT&T bill, Ms. Rountree would have a net gain of $1,280.00. This is due to a miscalculation of the value of the property awarded to Wife in the divorce. While the chart states that the property is valued at $18,528.18, the real value, which is not disputed by the parties, equals $9,285.77. Given Ms. Rountree's prior calculation, her net would actually have been a loss of 7,961.64. In his marital division chart submitted to this Court, Mr. Rountree points out and corrects

(continued...)

argues is inequitable compared to his less than $3,000.00 gain. However using the corrected figures and the undisputed evidence of the value of the property awarded to Ms. Rountree, her net gain is only $618.36. Given the testimony regarding the debts allocated to each party and Mr. Rountree's relative earning capacity, we conclude that the result based on the trial court's property division is not inequitable and we decline to assign additional debt to Ms. Rountree.

## IV. Conclusion

The judgment of the Chancery Court of Maury County is affirmed in part, reversed in part, vacated in part, and remanded. Costs of this appeal are taxed equally to Defendant/Appellant Joshua Rountree, and his surety, and Plaintiff/Appellee Katie J. Rountree, for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE

---

[10](...continued)
the miscalculation.