# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
April 8, 2015 Session

## MARK THOMAS WHITTEN v. DANA NICOLE WILLIS WHITTEN

**Direct Appeal from the Circuit Court for Maury County**
**No. 11879     Stella L. Hargrove, Judge**

---

**No. M2014-00645-COA-R3-CV – Filed June 18, 2015**

---

Mother appeals from the trial court's post-divorce determination that a modification of the parenting plan to designate Father as the primary residential parent of their children was in the children's best interest. Mother contends the trial court erred in considering statements of the parties' child made outside of court. Mother also contends the trial court erred in its application of the best interests factors set forth in Tennessee Code Annotated section 36-6-106. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN, J., and KENNY ARMSTRONG, J., joined.

Casey Adam Long and William Thomas Mullican, III, Franklin, Tennessee, for the appellant, Dana Nicole Willis Whitten.

S. Jason Whatley and George Clark Shifflett, III, Columbia, Tennessee, for the appellee, Mark Thomas Whitten.

## OPINION

### I.     BACKGROUND AND PROCEDURAL HISTORY

In September 2007, the Circuit Court of Maury County entered a decree of divorce ending the marriage of Dana Whitten ("Mother") and Mark Whitten ("Father"). The parties had two children during the marriage–a son, born in April 2005 and a daughter, born in January 2007. At the time of the divorce, Mother was not working, and Father was employed as a middle school teacher and football and soccer coach. The divorce

decree included a Permanent Parenting Plan that designated Mother primary residential parent of the children. The plan provided that the children would spend time with Father on alternating weekends and for two hours on Tuesday and Thursday afternoons.[1] Additionally, the plan provided that, at Father's discretion, Father's midweek visitation could take place in Mother's residence and, in such instances, Mother would be required to leave the residence.

Following the divorce, Mother and the children continued living in what was formerly the marital home–a three-bedroom house in Columbia. In 2009, the children's maternal grandmother moved into the house as well. That same year, Mother was able to find full-time employment teaching kindergarten and cleaning classrooms at a school in Spring Hill. In 2012, Mother enrolled both children in private school at the Columbia Academy. Father opposed Mother's decision to enroll the children in the school for doctrinal and educational reasons. Father wrote letters to administrators at the school to voice his objection and make it clear that he would not be held financially responsible for tuition. Nevertheless, the children have performed exceedingly well academically. In addition to school, the children are involved in numerous extracurricular activities. The parties' son plays baseball, basketball, football, and soccer, and their daughter participates in cheerleading and gymnastics.

Father lived with his parents for a period of time following the divorce. He continued teaching and, in his spare time, pursued training to become an Evangelical Episcopal priest. In June 2010, Father married his current wife, Julie Whitten ("Stepmother"). Like Father, Stepmother had two children from a previous marriage–sons, who were ages fifteen and twelve at the time of trial. Following his remarriage, Father's parents bought him a three-bedroom house on eighteen acres in nearby Lynnville, and Stepmother moved into the house along with her two sons. In May 2011, Father and Stepmother had a son together. Stepmother has not worked outside of the home since that time.

In February 2012, Father completed his religious training and was ordained as an Evangelical Episcopal priest. Later that year, Father took a leave of absence from teaching to pursue starting a church. Unfortunately, the financial strain of Father's decision to pursue ministry full-time quickly proved to be too burdensome. By 2013, Father had fallen behind on his child support obligations and was forced to seek other employment. In January 2014, he returned to education as a social studies teacher and soccer coach at the local middle school.

The relationship between Mother and Father following their divorce has been far

---

[1]The 2007 Parenting Plan is not in the record before this Court, but this allocation of parenting time is consistent with the parties' representations to the trial court.

from amicable. The parties have clashed on issues related to the children almost continuously since the time of their divorce. In September 2012, their constant bickering finally made its way into the courts when Mother filed a petition to modify the parenting plan, in which she raised concerns regarding Stepmother's involvement in exchanges of the children. In November 2012, Mother filed an amended petition asserting additional concerns about Father's financial support of the children.

In February 2013, Father filed his own petition to modify the parenting plan in which he sought to dismiss Mother's petitions for lack of service and essentially reverse the parties' roles under the original parenting plan. Father alleged that Mother interfered with his visitation time and attempted to alienate him and his family from the children by making disparaging remarks about them to the children. Father argued that awarding him primary custody of the children would serve their best interests. Additionally, Father sought to hold Mother in criminal contempt for numerous alleged violations of the original parenting plan. Along with his petition, Father submitted a list detailing fifty-eight alleged violations of the parenting plan Mother had committed since 2007.

Mother filed an answer to Father's petition in July 2013. Mother conceded that notice of her earlier motions had not been properly executed and asserted her claims through a counter-complaint. In the counter-complaint, Mother sought to modify the parenting plan to remove the provision allowing Father to exercise visitation at her home. Mother alleged that the provision was no longer necessary and that Father had routinely abused it by invading her privacy during the visits. Mother also alleged that Father failed to pay his share of the children's expenses and asked that he be required to do so. Perhaps not surprisingly, Mother also sought to hold Father in criminal contempt for violating the parenting plan, and her counter-complaint included a lengthy list of his alleged violations.

Following a period of discovery, the trial court conducted a hearing over the course of three days in March and April 2014. On the first day of trial, the parties mutually agreed to dismiss their respective claims for criminal contempt leaving only issues related to the modification of the parenting plan before the court. The court heard testimony from both parties and from various family members and coworkers of each party.

It is clear from the record that the animosity between the parties extended to their respective families following the divorce. The events recounted by the parties at trial demonstrate how those relationships had further devolved to a point where the families were almost incapable of civilized discourse. For instance, Mother allowed the children to attend Father's and Stepmother's wedding with the expectation that they would be returned home at a specific time. When Father's sister brought the children home two

hours later than the specified time, there was a verbal altercation between Mother, Mother's mother, and Father's sister. According to the testimony at trial, Mother told Father's sister that she wished someone had respected her enough to let her know the children would be late, to which Father's sister responded that Mother did not deserve respect. Mother's mother then told Father's sister that "You're all (Father's family) disgusting." Though Mother and Father's sister reconciled in a phone conversation later that night, the incident sparked a great deal of drama between the families. Shortly thereafter, Father's father sent a "nasty" letter to Mother's mother recounting all of the ways that he had helped her and Mother financially prior to the parties' divorce. This led Stepmother, in an attempt to calm tensions between the families, to send a letter to Mother expressing her hope for harmony between the two families. The attempt failed, however, and Mother sent a text message to Stepmother stating that her letter was "crap." Mother testified that Stepmother started calling and texting her repeatedly around this time to the point that Mother blocked her number. In messages introduced at trial, Stepmother told Mother she was "silly and dramatic" and a "bitter difficult woman." About a year later, the parties' daughter broke her collarbone, and Father's parents mailed her a get well card wishing her a speedy recovery and enclosed five dollars for ice cream. Rather than give the card to the child, Mother returned it to Father's parents along with a strongly worded letter indicating that she did not want to receive anything from them and demanding that they leave her and the children alone. The letter referenced the night of Father's wedding to Stepmother, stating in part:

> Also, there should NEVER be any reason, at all, for my children to EVER be left in the care of you, your husband, or any other family member for that matter!! You proved to me, once again, that I cannot trust anything you people say or do! If I had been thinking straight I would have reported you for kidnapping! I had NO idea where my children were for over 2 hours and that WAS NOT the arrangement that their father and I made!! But you decided to take it upon yourself to have control of MY children and change what their parents had arranged! That WILL NEVER HAPPEN AGAIN!

Despite Mother's demand, the children continued to visit Father's parents during their weekend visitation with Father. Mother, in time, apparently came to appreciate their efforts to entertain the children. In December 2013, Mother wrote a note to Father's mother praising her for providing a safe and happy place for the children.

In the meantime, however, animosity between the parties continued to manifest itself in their interactions with each other. Father introduced extensive notes he had taken over the years documenting Mother's hostility towards him. Additionally, Father recounted numerous specific instances in which Mother yelled at him and degraded him

in front of the children.[2] In some cases, Father testified, Mother's actions caused the children to become upset and start crying. Stepmother testified that on one occasion Mother got inches from her face during an exchange of the children and yelled at her to "shut up" and to "learn [her] place." She testified that Mother then instructed Father not to bring his wife to visitation again. During her testimony, Mother testified that Stepmother's story was a fabrication. Mother testified that Father had yelled at her on numerous occasions and recounted an incident in which he caused the children to cry by yelling at her in the parking lot after one of their son's football games. She recounted another occasion on which Father instructed her to "shut face" in a text message conversation.

Father testified at length that Mother made co-parenting "a very difficult and stressful process" since the divorce. For example, Father testified that Mother often would not answer or return his calls to confirm his visitation but would call repeatedly during his visitation times. Father recounted a specific instance during which Mother called him repeatedly while he was with the children. Father testified that when he did not answer the calls, Mother left messages demanding to know where they were and threatening to call the police if he did not tell her. Father played several of the voicemails Mother left on his phone for the court.

Father also recounted instances in which Mother refused to abide by the provisions of the parenting plan. For example, Father testified that Mother did not allow him to see their son on his third birthday because it fell on a date that was not part of his regular visitation. Father testified that when he told Mother that the parenting plan directed the parties to exercise shared visitation on birthdays, Mother indicated, in rather colorful terms, that she did not care what the parenting plan said. On another occasion, Father testified that he blocked Mother's number on his cell phone after she sent him "a barrage of derogatory texts." Father testified that when he arrived at Mother's house the following day to exercise his weekend parenting time, Mother refused to let the children leave with him. Father testified that Mother only relented after he called the police and an officer threatened to arrest her if she did not allow the children to leave. Father did testify that on some occasions, when he was unable to exercise his scheduled midweek visitation due to conflicts, Mother would allow him to make up the visitation on a different day. However, Father testified that in such instances Mother would refuse to leave her house or allow Father to leave with the children.

The parties also presented testimony regarding Father's suitability to be primary custodian of the children. Father testified that he and Stepmother had a happy marriage and that he had a good relationship with her sons. Father testified that the children

---

[2]Father testified that on various occasions, Mother called him "wicked," "evil," "little boy," "pathetic," "psychotic," "full of crap," "moron," "idiot," "stupid," and "the most pathetic piece of crap."

enjoyed participating in various outdoor activities at his house, such as hunting, hiking, building bonfires, and taking care of animals. Mother testified that she had concerns that Stepmother's sons were bullying and poking fun at the parties' son because of his nervous tics. Mother testified that when she tried to address the situation with Father, he told her it was no big deal. Stepmother denied that her sons had ever bullied the child. Additionally, Stepmother's oldest son testified that all of the children got along well.

One incident that received a great deal of attention at trial took place during an art show at the children's school. Mother, Father, Stepmother, and Mother's mother all witnessed the incident and testified about it at trial. According to the parties, the children were showing Father their art work when Mother either indicated that it was time for them to leave or asked to take a picture of the children. In any event, Father responded by stating that he was not finished talking to the children. From there, the parties' accounts of the incident vary. Father testified that Mother "jumped out at [him]" and "started getting angry, pitching a fit, raising her voice." Father testified that the parties' son jumped in front of her and said "no mommy, don't do this here." [3] Father testified that Stepmother glanced at Mother with a look of disbelief and Mother "lunged at [her]." Similarly, Stepmother testified that Mother lunged at her and that the child tried to cover her mouth and said "no, not here, something to that effect." Not surprisingly, the testimony provided by Mother and Mother's mother regarding the incident differs somewhat from the accounts provided by Father and Stepmother. Mother's mother testified that she witnessed the whole exchange and that Mother did not lunge at Stepmother. In fact, Mother's mother testified that there was no communication at all between Mother and Stepmother during the incident. Finally, Mother testified that when Father asked for her to wait, she apologized and told him she thought he was finished looking at the exhibits. Mother testified that when she turned around, Stepmother was giving her a "dirty look," and Mother told her not to cause problems. Mother denied that she ever lunged at Stepmother.

On April 24, 2014, the trial court entered a written order reflecting its findings and conclusions. The court expressed concern with the unwillingness of both parties to be flexible and to respect each other but placed the majority of the blame on Mother. The court found that Mother was overly protective of the children and interfered with Father's parenting time. The court characterized Mother as confrontational and expressed concern with her temper and volatility. Notably, with regard to the art show incident, the court found that the testimony of Mother and Mother's mother was not credible and stated that the child's attempt to calm Mother during the incident "speaks volumes." Citing its concerns with her temper, the court recommended that Mother seek counseling. The court found that Father's home would provide a more normal environment for the

---

[3]Mother's counsel objected to the statement of the parties' son as hearsay, but the trial court allowed it as falling under the excited utterance hearsay exception.

children.  Accordingly, the court concluded that a material change in circumstances had occurred since the original parenting plan was entered and that modifying the plan to name Father the primary residential parent would serve the children's best interests. Mother timely filed a notice of appeal to this Court.

## II. ISSUES PRESENTED

Mother presents the following issues for our review:

1.  Whether the trial court erred in admitting hearsay testimony attributed to the parties' minor child?

2.  Whether the trial court erred by failing to appropriately apply the factors in Tennessee Code Annotated section 36-6-106 in making a comparative fitness determination.

## III. ANALYSIS

On appeal, we review the record of the proceedings below *de novo* with a presumption that the trial court's factual findings are correct.  Tenn. R. App. P. 13(d). We will not disturb the trial court's findings unless the evidence preponderates against them.  *Id.*; *Burden v. Burden*, 250 S.W.3d 899, 904 (Tenn. Ct. App. 2007).  As to the trial court's conclusions on matters of law, however, our review is *de novo* with no presumption of correctness.  *Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005). Finally, because the trial court is in the best position to assess the credibility of the witnesses, such credibility determinations are entitled to great weight on appeal.  *Burden*, 250 S.W.3d at 905.  Mother presents two issues on appeal, and we address each separately.

### *Hearsay Testimony*

At trial, Father and Stepmother testified that they heard the parties' son say "no mommy, don't do this here," during the art show incident.  Counsel for Mother objected to the testimony arguing that it was hearsay, but the trial court overruled the objection.  In its order, the trial court stated that this statement "speaks volumes" about the effect of the parents' toxic relationship on the children.  Mother contends that the statement was inadmissible hearsay that influenced the trial court's ruling.  Father contends, among other things, that the statement was a command, and, therefore, not hearsay because it was not offered to prove the truth of the matter asserted.

The Tennessee Rules of Evidence define hearsay as "a statement, other than one

made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, a hearsay statement is not admissible unless it falls under one of the exceptions to the rule against hearsay. Tenn. R. Evid. 802. A trial court's determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left the sound discretion of the trial court. *In re Isaiah L.*, 340 S.W.3d 692, 706 (Tenn. Ct. App. 2010) (citing *State v. Stout*, 46 S.W.3d 689, 697 (Tenn. 2001)). As such, we will not reverse the trial court's ruling absent a showing that this discretion has been abused. *Stout*, 46 S.W.3d at 697.

The trial court ruled that the child's statement was admissible under the excited utterances exception to the rule against hearsay, which provides that an otherwise inadmissible hearsay statement is admissible if shown to be "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *See* Tenn. R. Evid. 803(2). If we were to determine that the child's statement constituted hearsay, we would address Mother's argument that the events that transpired immediately before he spoke were not sufficiently startling to warrant admission of the statement as an excited utterance. However, we agree with Father's assertion that the child's statement was a command, and, therefore, not hearsay.

"[C]ommands or instructions are not hearsay if they are not offered to prove the truth of the matter asserted." *State v. Cartmell*, No. M2012-01925-CCA-R3-CD, 2014 WL 3056164, at *16 (Tenn. Crim. App. July 7, 2014), *perm. app. denied* (Tenn. Nov. 20, 2014) (citing *State v. Lequire*, 634 S.W.2d 608, 612 (Tenn. Crim. App.1981)); *see also State v. Guinn*, No. W2013-01436-CCA-R3-CD, 2014 WL 3513000, at *7 (Tenn. Crim. App. July 15, 2014) (*no perm. app. filed*); *State v. Emesibe*, No. M2003-02983-CCA-R3-CD, 2005 WL 711898, at *10 (Tenn. Crim. App. Mar. 28, 2005), *perm. app. denied* (Tenn. Oct. 17, 2005); *State v. Payne*, No. W2001-00532-CCA-R3-CD, 2002 WL 31624813, at *10 (Tenn. Crim. App. Nov. 20, 2002), *perm. app. denied* (Tenn. May 19, 2003); *State v. Sanford*, No. E1999-02089-CCA-R3-CD, 2001 WL 681312, at *6 (Tenn. Crim. App. June 18, 2001), *perm. app. denied* (Tenn. Nov. 5, 2001); *State v. Mabone*, No. 02C01-9203-CR-00054, 1993 WL 270618, at *1 (Tenn. Crim. App. July 21, 1993), *perm. app. denied* (Tenn. Oct. 4, 1993). In *State v. Payne*, the Court of Criminal Appeals held that a declarant's instruction "Derek, don't shoot. Derek, don't shoot," did not qualify as hearsay because it was not offered to prove the truth of the matter asserted. *Payne*, 2002 WL 31624813, at *9. Likewise, in this case, we conclude that the child's statement "no mommy, don't do this here," does not qualify as hearsay. Therefore, although the trial court erred in finding the statement admissible under the excited utterances exception to the rule against hearsay, it did not err in admitting the statement.

Mother also argues that the trial court erred by admitting Tom Whitten's testimony

that he heard the child say "Grandma you're ugly." Once again, Mother contends that the statement was inadmissible hearsay and that it influenced the trial court's ruling. This statement was not offered to prove the truth of the matter asserted. We therefore conclude that the statement was not hearsay, and the trial court did not err in admitting it.

### *Modification of Custody*

Next, Mother challenges the trial court's decision to modify the parties' parenting plan to designate Father as the primary residential parent. Mother argues that the trial court erred in its analysis by failing to consider all of the relevant factors and that remaining in her custody would serve the children's best interests. We disagree.

Trial courts have broad discretion in fashioning child custody and visitation arrangements that best suit the unique circumstances of each case. *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999). This is because such decisions often hinge on subtle factors, such as the parents' demeanor and credibility during the proceedings. *Rountree v. Rountree*, 369 S.W.3d 122, 129 (Tenn. Ct. App. 2012). Accordingly, appellate courts are reluctant to second-guess a trial court's determinations regarding custody and visitation. *Parker*, 986 S.W.2d at 563. We will set aside a trial court's decision regarding custody or visitation only when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Robinson v. Robinson*, No. M2014-00431-COA-R3-CV, 2015 WL 1259265, at *2 (Tenn. Ct. App. Mar. 16, 2015) (citing *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)).

Although preserving an existing custody arrangement is generally favored, courts may modify an award of child custody from one parent to the other "when both a material change of circumstances has occurred and a change of custody is in the child's best interests." *Kendrick v. Shoemake*, 90 S.W.3d 566, 568 (Tenn. 2002); *see also* Tenn. Code Ann. § 36-6-101(a)(2)(B)-(C)(2010). Thus, the trial court's decision to modify custody involves a two-part test. As a threshold issue, the trial court must determine whether there has been a material change in circumstances since the last custody determination. *In re M.J.H.*, 196 S.W.3d 731, 744 (Tenn. Ct. App. 2005). If a material change of circumstances has occurred, the court must then proceed to the second step of the analysis and determine whether the modification sought is in the child's best interest. *Id.*

Mother does not challenge the trial court's conclusion that Father established a material change in circumstances from the entry of the 2007 Plan. She only contends that the trial court erred in determining that the children's best interests would be served by modifying the plan to designate Father as the primary residential parent. We are

therefore tasked only with addressing the second step of the modification test in this case.

As we stated previously, trial courts have a great deal of discretion in making custody determinations that best suit the unique circumstances of each case. *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999). However, that discretion is limited to some degree by the statutory directive that such determinations "shall be made on the basis of the best interest of the child." Tenn. Code Ann. § 36-6-106(a). Additionally, Section 36-6-106 directs the court to consider all relevant factors, including, where applicable, the following:

> (1) The love, affection and emotional ties existing between the parents or caregivers and the child;
> (2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;
> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; . . .
> (4) The stability of the family unit of the parents or caregivers;
> (5) The mental and physical health of the parents or caregivers. . . .
> (6) The home, school and community record of the child;
> (7)(A) The reasonable preference of the child, if twelve (12) years of age or older;
> (B) The court may hear the preference of a younger child on request. The preferences of older children should normally be given greater weight than those of younger children;
> (8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; . . .
> (9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and
> (10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. . . .

Tenn. Code Ann. § 36-6-106(a)(1)-(10)(2013).[4]

---

[4]Effective July 1, 2014, the statute was amended to provide a list of fifteen factors for courts to consider in making a custody determination. Tenn. Code Ann. § 36-6-106 (2014). For purposes of this opinion, however, we consider the statute as it was written at the time of the hearing in this case.

Mother argues that the trial court failed to appropriately apply the statutory factors in making a determination as to the comparative fitness of the parents. Had the court done so, she argues, those factors would weigh in her favor, and the court would not have concluded that the children's best interest would be served by changing custody to Father.

We find no evidence in the record to indicate that the trial court abused its discretion in designating Father as the primary residential parent of the children. Mother correctly asserts that the trial court did not list and discuss each of the statutory factors. However, the trial court was not required to do so. *See Keisling v. Keisling*, 196 S.W.3d 703, 723 (Tenn. Ct. App. 2005) ("[T]he absence of an explicit discussion of each factor does not mean that they were not considered."); *see also Mueller v. Mueller*, No. W2004-00482-COA-R3-CV, 2004 WL 2609197, at *6 (Tenn. Ct. App. Nov. 17, 2004), *perm. app. denied* (Tenn. Mar. 21, 2005); *Burnett v. Burnett*, No. E2002-01614-COA-R3-CV, 2003 WL 21782290, at *6 (Tenn. Ct. App. July 23, 2003) (*no perm. app. filed*). The statute requires the court to consider all of the listed factors that are applicable. However, the statute does not require the court, in its memorandum opinion or final judgment, to list each applicable factor along with its conclusion as to how that particular factor impacted the overall judgment.[5]

Though it did not explicitly cite the Section 36-6-106(a) factors in its order, the trial court referenced several of the statutory factors in its discussion of the children's best interests. The court noted that due to the young age of the children, their preferred custody arrangement was not a relevant factor. The court's order demonstrates, however, that other factors were relevant to its decision. As in most cases, some of the relevant factors weigh equally in favor of both parents while others tend to favor one parent over the other. For example, the trial court found that the love, affection, and emotional ties existing between each parent and the children weighs equally in favor of both parents, while the degree to which one parent has been the primary caregiver weighs in favor of Mother. A factor that clearly favors Father is his ability to facilitate and encourage a good relationship between the children and Mother. Though the trial court found fault with the willingness of both parents to facilitate a good relationship with the other, its findings reveal that this factor weighed heavily in Father's favor. The court found that Mother, among other things, was "unreasonable" and "confrontational." The court found that Mother was over-protective of the children, that she overreacted to minor incidents, and that she interfered with Father's parenting time. The court found that Mother attempted to alienate Father's parents from the children. The court expressed its concern for Mother's temper and volatility and recommended she seek counseling. The record supports these findings by the trial court.

---

[5]Of course, we strongly encourage trial courts to be as detailed as possible in communicating their findings and conclusions.

Mother contends that the trial court failed to consider the importance of continuity in the children's lives and the children's exceptional school records while in her care. She argues that, if considered, the court certainly would have found that these factors weighed in her favor. We disagree. The trial court expressly referenced the importance of continuity in its order and acknowledged that Father intended to enroll the children in a public school if granted custody. The court found that the children are "flexible, intelligent, and resilient, and can transition easily from one school to another." The record supports the trial court's finding. In fact, the parties' son already demonstrated the ability to successfully transition into a new school when Mother took him out of public school and enrolled him in private school prior to the 2012-2013 school year.

Finally, as we noted above, custody decisions often hinge on subtle factors such as the credibility and demeanor of witnesses. *Rountree v. Rountree*, 369 S.W.3d 122, 129 (Tenn. Ct. App. 2012). The trial court found that Mother was not a credible witness. We will not reverse the trial court's findings based on witness credibility in the absence of clear and convincing evidence to the contrary. *James v. James*, 344 S.W.3d 915, 919 (Tenn. Ct. App. 2010). We find no such evidence in this case.

## IV. CONCLUSION

In light of the foregoing, we affirm the trial court's decision to modify the parties' parenting plan to designate Father the children's primary residential parent. Costs of this appeal are taxed to the appellant, Dana Whitten, and her surety, for which execution may issue, if necessary.

_____
BRANDON O. GIBSON, JUDGE