IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 9, 2016 Session

## VICTORIA HOPE MASHBURN v. TYLER DAVID MASHBURN

**Appeal from the Domestic Relations Court for Meigs County**
**No. D-1434      Casey Stokes, Judge**

**No. E2015-01173-COA-R3-CV-FILED-JUNE 30, 2016**

In this divorce action, Tyler David Mashburn (Father) argues that the trial court erred by including certain provisions in the permanent parenting plan, *i.e.*, (1) a requirement that his residential parenting time with the parties' son be supervised; (2) a provision prohibiting Father's girlfriend from staying overnight during Father's parenting time; (3) a provision that Father shall have no additional residential parenting time for holidays or vacations unless Victoria Hope Mashburn (Mother) agrees; and (4) a provision that all major decisions regarding the child shall be made exclusively by Mother. We modify the plan by deleting all of these provisions. Furthermore, we reverse the trial court's decision to award Mother attorney's fees of $5,000.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Domestic Relations Court Modified in Part and Reversed in Part; Affirmed as Changed by this Opinion; Case Remanded for Further Proceedings**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

David L. Valone, Knoxville, Tennessee, for the appellant, Tyler David Mashburn.

Randy G. Rogers, Athens, Tennessee, for the appellee, Victoria Hope Mashburn.

### OPINION

### I.

The parties were married in May 2007. One child was born to their marriage. Mother filed this action for divorce in July 2013. Following a hearing on October 16, 2013, the trial court entered an order providing a temporary co-parenting schedule pending trial. That order provides:

That the Father shall have co-parenting time with the parties['] minor child for the next three weekends from Saturday at 6:30 p.m. to Sunday at 6:30 p.m. . . . [B]eginning the weekend of November 8th the Father will have every weekend from Friday at 6:30 p.m. until Sunday at 6:30 p.m. The Father will be allowed to pick up the minor child on his way from work to his parent's house in Loudon County, Tennessee. Once he has the child he will be required to have co-parenting time supervised twenty-four seven (24/7) at his parent's residence. That means he is not allowed to have the child alone at any time pending further orders of the Court except when he picks the child up at the start of his co-parenting time.

The trial court did not make any findings explaining why Father's visitation was required to be supervised. There is no transcript of the October 16, 2013 hearing. At this point, the only thing in the record pertaining to a supervision requirement was Mother's statement in her complaint as follows:

[Mother] would show that [Father] confessed to [her] that he has most recently had suicidal thoughts and that he indicated that he would rather commit suicide than continue to be married to [Mother].

\* \* \*

[Mother] would show that . . . [Father] should have limited co-parenting time with the child based on the child's tender age and that fact that he continues to be nursed and conditioned upon the court's determination that [Father] is presently emotionally able to be with the child without supervision based on his previous discuss[ion] of suicidal thoughts.

On October 14, 2014, Mother filed an "emergency motion" for a temporary order suspending Father's visitation rights. Mother alleged that

there is reason to believe that the child may have been inappropriately touched while during visitation and not under the supervision of the designated supervisors or the natural

2

father of the child and that there is presently an ongoing children's services investigation with regard to the allegations.

The trial took place on December 10, 2014. The primary witnesses were Mother, Father, and Amelia Rose, an investigator employed by the Department of Children's Services who conducted a sexual abuse investigation. The paternal grandfather testified briefly. Mother's entire testimony regarding her concerns about the possible treatment of the child was as follows:

Q: All right. Tell the Court what your concerns are in every respect.

A: In every respect?

Q: Yes.

            \*       \*       \*

A: I mean my concerns are, who is he with, how is he being treated, what's he being given, where is he at, what are people doing to him. I mean every concern any parent would have. You can imagine your worst nightmare.

Q: . . . If you would, just briefly go through the observations you saw when you became alarmed about the child's demeanor.

A: [The child] had started putting stuffed animals on his private part, and wanting me to touch him, touching himself, and he told me that, you know, if you bite, bite there and he was screaming out in his sleep and things as that, you know. That's what he was doing.

            \*       \*       \*

Q: Did you – other than what you've described were there any other behaviors that you noticed?

A: You know, it's like the second time he had taken off his diaper and that's when he was wanting me to touch him. And

3

I put it back on him. And then during the night he must have taken it off again because he woke up without it on. He had been having problems the last few months with diaper changes. I don't know if that was all related or not, but he's fine with diaper changes now.

Q: Had he ever had a problem with taking his diaper off like that before?

A: And wanting it to stay off instead, no.

Mother admitted that she "never reported that [Father] did anything inappropriate;" nor did she allege or present proof at trial that anyone else did anything inappropriate with the child regarding the allegation in her emergency motion that "there is reason to believe that the child may have been inappropriately touched while during visitation." Father testified that, to his knowledge, nothing inappropriate had occurred with the child while he was exercising residential parenting time.

Ms. Rose, the DCS investigator, testified that she conducted a full sexual abuse investigation and concluded that the allegations were "unfounded." She said that Mother had expressed her concerns that Father's girlfriend, referenced in the record by her first name, Katrina, might have abused the child. At the time of trial, Katrina had four children of her own, including one with Father who was born about ten months after the parties in this case separated. Ms. Rose further testified that, based on the results of DCS's investigation, there was no reason to require Father's visitation with the child to be supervised or otherwise restricted. She stated that she found no reason that anyone, including Katrina, should be restricted from being around the child.

Father testified that at times when the child spent the night at the home of Father's parents, he and Katrina stayed in the same room overnight with the child. At this point, the child would have been between fourteen and thirty-one months old; he was around thirteen months at the time of separation, and thirty-one months at the time of trial. At trial, Mother presented the theory that the child may have witnessed Father and Katrina having sex while he was in their room, which might have accounted for the child's alleged behavior that Mother found disturbing. Father denied that this was a possibility, and there was no evidence presented that he and his girlfriend had behaved inappropriately in the child's presence.

At the conclusion of trial, the trial court made the following oral findings and conclusions:

> There has been – there's been issues of credibility in this case, we all know that. And there's been an issue with the child about, maybe not what [Father] does with the child, but maybe – seems from the testimony I heard that maybe the child has seen something that the child shouldn't have seen. That happened on [Father's] watch. And there was an issue about where Katrina sleeps and [Father] might not have been as honest about that as he should have been. And that could have been the reason that the child seen [sic] something he shouldn't have seen. So, I think for now, at least a couple of years when the child can be more articulate, I think Mr. Mashburn should have every other weekend visitation. I think it should be supervised.
>
>             \*         \*         \*
>
> I want to put in the order that Katrina can't spend the night over at their house with [Father] on the weekend that he has the boy. I think that would prevent him from seeing something or whatever that maybe he shouldn't see.

The trial court ordered Father to pay Mother's attorney's fees in the amount of $5,000. The permanent parenting plan ordered by the court gives Father visitation from Friday at 6:00 pm to Sunday at 6:00 pm every other week. It further provides that "[t]here shall be no additional co-parenting time for holidays or otherwise, in that the Father shall be granted additional co-parenting time at such times as the Mother agrees." Consequently, without Mother's consent and agreement, Father has no right to see the child on Christmas, his birthday, or any other holiday or vacation time. The parenting plan mandates that "Father's co-parenting time shall be supervised by his parents at all times" and "[t]he Father's friend, Katrina, shall not spend the night with the Father when the minor child is present." Father timely filed a notice of appeal.

## II.

Father raises the following issues:

> 1. Whether the trial court erred in requiring Father's co-parenting time to be supervised and ordering that his girlfriend could not stay overnight during Father's co-parenting time.

2. Whether the trial court erred in ordering that Father would have no co-parenting time for holidays or vacations without Mother's agreement, and that major decisions regarding the child would be made by Mother instead of jointly.

3. Whether the trial court erred in ordering Father to pay Mother's attorney's fees.

## III.

With regard to all issues in this case, our review is de novo upon the record of the proceedings below. However, that record comes to us with a presumption that the trial judge's factual findings are correct. Tenn. R. App. P. 13(d). We must honor this presumption unless we find that the evidence preponderates against those findings. *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984). There is no presumption of correctness with respect to the trial court's conclusions on matters of law, *Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005), or on its application of the law to the facts. *State v. Thacker*, 164 S.W.3d 208, 247-48 (Tenn. 2005).

Trial courts are vested with broad discretion in framing parenting plans. *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999). We review such determinations under an abuse of discretion standard. *Id.* Under such a standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to [the] propriety of the decision made." *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000); *State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000). A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)).

As this Court has frequently observed,

> The central concern in any custody and visitation ruling is the best interest of the children. *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996). The interest of the parents are secondary. *Id.* "Custodial arrangements should not be made with the goal of punishing a parent for misconduct. Nonetheless, misconduct of a party does often reflect fitness of the parent for custody and is a proper consideration." *Barnhill v. Barnhill*, 826 S.W.2d 443, 453 (Tenn. Ct. App. 1991) (citations omitted). The "details of custody and visitation with children are peculiarly within the broad

6

discretion of the trial judge." ***Eldridge v. Eldridge***, 42
S.W.3d 82, 85 (Tenn. 2001) (quoting ***Edwards v. Edwards***,
501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)).

***Miller v. Miller***, 336 S.W.3d 578, 583 (Tenn. Ct. App. 2010). We have also stated that
"[t]rial courts have broad discretion to make decisions regarding parenting arrangements,
but those determinations must be made based on proof and applicable principles of law."
***Mobley v. Mobley***, No. E2012-00390-COA-R3-CV, 2013 WL 1804189, at *11 (Tenn. Ct.
App., filed Apr. 30, 2013) (citing ***Chaffin v. Ellis***, 211 S.W.3d 264, 286 (Tenn. Ct. App.
2006)).

## IV.

Tenn. Code Ann. § 36-6-106(a) (2014) directs a trial court to consider the
following statutory factors in making a custody and visitation determination on the basis
of the best interest of a child:

> (1) The strength, nature, and stability of the child's
> relationship with each parent, including whether one (1)
> parent has performed the majority of parenting
> responsibilities relating to the daily needs of the child;
>
> (2) Each parent's or caregiver's past and potential for future
> performance of parenting responsibilities, including the
> willingness and ability of each of the parents and caregivers
> to facilitate and encourage a close and continuing parent-child
> relationship between the child and both of the child's
> parents[.]
>
> (3) Refusal to attend a court ordered parent education seminar
> may be considered by the court as a lack of good faith effort
> in these proceedings;
>
> (4) The disposition of each parent to provide the child with
> food, clothing, medical care, education and other necessary
> care;
>
> (5) The degree to which a parent has been the primary
> caregiver, defined as the parent who has taken the greater
> responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. . . .

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

In this case, the trial court did not refer to Tenn. Code Ann. § 36-6-106 or make any findings of fact regarding the statutory factors provided therein. As we recently observed in *Port v. Hatton*, No. M2011-01580-COA-R3-CV, 2013 WL 865549, at *6 (Tenn. Ct. App., filed Mar. 6, 2013),

While the trial court is directed to consider the appropriate factors in reaching its decision, it is not required to list each factor with the court's conclusion about how that factor impacted the custody decision.

If the court has not set out specific findings of fact incorporating its reasoning about the statutory factors, the appeals court may remand the case to the trial court to make such findings, . . . or we may ourselves make an independent review of the record to determine if it supports the trial court's conclusions.

(Internal citations omitted.)

Additionally, the General Assembly has directed that every divorce judgment "involving a minor child shall incorporate a permanent parenting plan." Tenn. Code Ann. § 36-6-404(a) (2014). In *Rountree v. Rountree*, 369 S.W.3d 122, 129 (Tenn. Ct. App. 2012), this Court stated,

> In fashioning parenting plans, Tennessee Code Annotated Section 36-6-401 advises courts that:
>
>> The [G]eneral [A]ssembly recognizes the fundamental importance of the parent-child relationship to the welfare of the child, and the relationship between the child and each parent should be fostered unless inconsistent with the child's best interests. The best interests of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care.
>>
>> \* \* \*
>>
>> Most children do best when they receive the emotional and financial support of both parents.
>
> Recently our legislature amended the child custody statute to include a statement emphasizing this policy. *See* 2011 Pub. Acts, ch. 433, § 1 (effective June 6, 2011). Tennessee Code

Annotated Section 36-6-106(a) now provides, in pertinent part:

> In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in subdivisions (a)(1)-(10), the location of the residences of the parents, the child's need for stability and all other relevant factors.

> Accordingly, Tennessee courts must now fashion custody arrangements so as to give each parent the maximum amount of time possible with the child, in accordance with the child's best interests.

In the present case, Father argues that the trial court's supervision requirement and the provision barring his girlfriend, who is also the mother of his second child, from staying overnight during his visitation is unduly restrictive and unwarranted by the evidence presented. We agree. Tenn. Code Ann. § 36-6-406 specifically addresses restrictions in temporary or permanent parenting plans. It provides:

> (a) . . . [A] parent's residential time as provided in the permanent parenting plan or temporary parenting plan shall be limited if it is determined by the court, based upon a prior order or other reliable evidence, that a parent has engaged in any of the following conduct:

>> (1) Willful abandonment that continues for an extended period of time or substantial refusal to perform parenting responsibilities; or

>> (2) Physical or sexual abuse or a pattern of emotional abuse of the parent, child or of another person living with that child as defined in § 36-3-601.

> (b) The parent's residential time with the child shall be limited if it is determined by the court, based upon a prior order or other reliable evidence, that the parent resides with a

person who has engaged in physical or sexual abuse or a pattern of emotional abuse of the parent, child or of another person living with that child as defined in § 36-3-601.

(c) If a parent has been convicted as an adult of a sexual offense under § 39-15-302, title 39, chapter 17, part 10, or §§ 39-13-501 – 39-13-511, or has been found to be a sexual offender under title 39, chapter 13, part 7, the court shall restrain the parent from contact with a child that would otherwise be allowed under this part. If a parent resides with an adult who has been convicted, or with a juvenile who has been adjudicated guilty of a sexual offense under § 39-15-302, title 39, chapter 17, part 10, or §§ 39-13-501 – 39-13-511, or who has been found to be a sexual offender under title 39, chapter 13, part 7, the court shall restrain that parent from contact with the child unless the contact occurs outside the adult's or juvenile's presence and sufficient provisions are established to protect the child.

(d) A parent's involvement or conduct may have an adverse effect on the child's best interest, and the court may preclude or limit any provisions of a parenting plan, if any of the following limiting factors are found to exist after a hearing:

> (1) A parent's neglect or substantial nonperformance of parenting responsibilities;
>
> (2) An emotional or physical impairment that interferes with the parent's performance of parenting responsibilities as defined in § 36-6-402;
>
> (3) An impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting responsibilities;
>
> (4) The absence or substantial impairment of emotional ties between the parent and the child;

(5) The abusive use of conflict by the parent that creates the danger of damage to the child's psychological development;

(6) A parent has withheld from the other parent access to the child for a protracted period without good cause;

(7) A parent's criminal convictions as they relate to such parent's ability to parent or to the welfare of the child; or

(8) Such other factors or conduct as the court expressly finds adverse to the best interests of the child.

The trial court made no findings with regard to the statutory factors set forth in subsections (d)(1)-(8).

Tennessee appellate courts have addressed the principles that apply to a decision to restrict or eliminate a parent's visitation. In *F.A.B. v. D.L.B.*, a case involving false and unfounded allegations of sexual abuse by a parent, this Court said:

> "Because of the legal and psychological significance of a parent's visitation rights, persons seeking to restrict or eliminate visitation must demonstrate that there is probable cause that the child will be placed at risk if visitation is permitted." *Bueno v. Todd*, No. W2005–02164–COA–R3–CV, 2006 WL 2106006, at *6 (Tenn. Ct. App.[, filed] July 31, 2006). . . . These evidentiary standards have effectively created a presumption against severely circumscribing or denying visitation to non-custodial parents. Such drastic measures are only appropriate when arrangements less detrimental to the parent-child relationship are not available or workable as a practical matter.
>
> This Court has summarized the process for a trial court to consider limiting, suspending or terminating all parenting time by the alternative residential parent:

Accordingly, there is a specific process the trial court must follow when limiting, suspending or terminating visitation. First, the trial court must make a specific finding, based on definite evidence, that visitation would cause harm to the child. After making this finding, the trial court must then determine the least restrictive visitation plan as available and practical. In determining the least restrictive visitation plan, the trial court must make specific findings, based on definite evidence, that any less restrictive visitation would be harmful to the child. The burden of proof on both the issue of harm and the least restrictive visitation plan, is on the party seeking to restrict visitation.

*Rudd* [*v. Rudd*, No. W2011-01007-COA-R3-CV,] 2011 WL 6777030, at *5 [Tenn. Ct. App., filed Dec. 22, 2011] (citations omitted). In considering the issue, the trial court must bear in mind that "it is the public policy of the state of Tennessee that courts shall grant parenting time with the non-custodial parent unless visitation will harm the child." *Id.* (emphasis in original omitted) (quoting *Kershaw v. Kershaw*, No. M2009–00151–COA–R3–CV, 2009 WL 4039262, at *3 (Tenn. Ct. App.[, filed] Nov. 20, 2009)).

*F.A.B. v. D.L.B.*, No. M2012-01100-COA-R3-CV, 2013 WL 5872284, at *19-20 (Tenn. Ct. App., filed Oct. 29, 2013) (internal quotation marks and citations omitted); *see also Melvin v. Melvin*, 415 S.W.3d 847, 851 (Tenn. Ct. App. 2011) ("Notwithstanding the discretion afforded the trial court in matters of child custody, the least restrictive visitation limits generally are favored in order to encourage the parent-child relationship"); *Malmquist v. Malmquist*, No. W2007-02373-COA-R3-CV, 2011 WL 1087206, at *23 (Tenn. Ct. App., filed Mar. 25, 2011) (Tenn. Code Ann. § 36-6-301 suggests restriction of visitation is appropriate if unsupervised visitation "is likely to endanger the child's physical or emotional health."); *Wix v. Wix*, No. M2000-00230-COA-R3-CV, 2001 WL 219700, at *10 (Tenn. Ct. App., filed Mar. 7, 2001) ("Tennessee's courts have repeatedly recognized that custody and visitation arrangements should interfere with the parent-child relationship as little as possible," but "[t]he courts may restrict, suspend, or terminate visitation rights upon the presentation of clear and definite evidence that permitting continued visitation will jeopardize the child physically, emotionally, or morally").

In the present case, the trial court ordered that all of Father's residential parenting time be supervised. This is a significant restriction on Father's visitation. The only finding made by the trial court to justify this restriction was its observation, already quoted in full above, that "maybe the child has seen something that the child shouldn't have seen." However, there is no proof in the record that this happened. DCS investigator Rose testified as follows:

> Q: Do you feel that in this investigation that you did as thorough [an] investigation as possible?
>
> A: I don't know what else I could have done, so yes.
>
>            *      *      *
>
> Q: And your findings were what?
>
> A: Unfounded.
>
> Q: Unfounded. And remember the question I asked you about the hypothetical, that the mother was saying that she was concerned that this Katrina girl may have done something to her son, do you remember that?
>
> A: Correct.
>
> Q: And remember I asked you if you thought something like that happened, and you know she has children, correct?
>
> A: Correct.
>
> Q: But you didn't – DCS did not do anything to think, well, we may need to protect those children in her household, did you?
>
> A: Correct.
>
>            *      *      *

Q: What would the State of Tennessee directed through the Department of Children's Services if they thought something was occurring, what would you all have done?

A: There would have been a referral made regarding those children.

Q: Did you make a referral relative to those children?

A: I did not.

Q: Have you – did the Department of Children's Service[s], put any restrictions on [Father] as to – in relation to his seeing his child?

A: No.

Q: Did you put any restrictions on, and I'm not sure of Katrina's last name, but the individual that's been referred to as Katrina, did you put any restrictions on her as it relates to seeing [the child]?

A: No.

On cross-examination, Ms. Rose further stated,

Q: Now, in terms of your interview with Katrina and in terms of your interview with [Father], did you discuss with them circumstances that might be less than an offensive touching, but exposure to sexual activity?

A: I don't believe I understand your question.

Q: Did you ask them, hey, have you slept together, engaged in sex while the child was in the same room with you?

A: I don't believe I asked those questions.

Q: And certainly as an investigator and a person in your position, you would certainly agree that if in fact cohabitation, sexual activity occurred in the presence of the

15

child, that would not be appropriate, would it? . . . Do you think people ought to engage in sexual activity in front of a child of two and a half years of age?

A: Purposefully, that would be exposure.

Q: Right. And that would be something that you find actionable, wouldn't you?

A: Concerning.

Q: And did you ask them about their sleeping arrangements at various locations when they've been in the presence of the child?

A: As far as the child sleeping in the bedroom with them, no.

Q: If in fact, hypothetically, you had discovered that they in fact cohabitated together in a small bedroom with the child present, would that have caused you some concerns based upon the allegations that were being made?

A: If a two year old child that was sleeping in the same bedroom with two adults; is that what you're asking? That's not necessarily alarming.

*     *     *

Q: Ma'am, are you telling me as an investigator in this case where the allegation is that the child was began – and this is what was forwarded to you, that the child began to exhibit bizarre behavior like rubbing stuffed animals on his penis, taking his diaper off and asking his mother to touch his penis in a very unusual way.

A: If the child was awake and they were purposefully having sex in front of the child that would be concerning. But if it was a situation where they were having sex and they were unaware that the child was awake, then that's not as concerning, but that would have been addressed.

16

Q: But that would certainly be a reason that the child had developed the problem or the problems, correct?

A: It could.

Q: If the allegation was Katrina bite, bite, and touching his penis, then that would indicate that he saw Katrina bite, bite someone else's penis, couldn't it?

A: It could.

*      *      *

Q: Did [Mother] tell you that the child indicated that Katrina bite, bite, those words, while he was indicating touching on his penis?

A: She said that, yes.

Q: And if in fact Katrina was engaged in sexual activity of that nature with [Father] in the bedroom, whether it was purposeful or not, that would explain something that shouldn't happen in front of the child, wouldn't it?

A: That would be something that I would address with them.

*      *      *

Q: How about this, how about I just boil it all down to this. Do you have any concerns that this young child has had some sort of exposure that caused him to exhibit this behavior?

A: He has not reported it to a professional. The only person I know that he has said anything to is his mother. The background of the case is that there is a custody battle right now, and I have told her that we believe there was nothing that I found.

Regarding past sleeping arrangements, Father testified as follows:

17

Q: And you acknowledge that you and Katrina, while at your parents['] home when [the child] was there slept in the same bedroom together with [the child]?

A: Yes, sir.

Q: Do you know any reason why you told the Judge otherwise in our last hearing?

A: I said sometimes she sleeps in another bed and you asked another question before I could finish. Sometimes she sleeps in there with [her children] because they can't go to sleep because it's a new environment. Other times she sleeps in the room. Sometimes she sleeps in a whole separate room, just depends on what all kids are there and what we got going on. That's all. That's the whole scenario.

\*     \*     \*

Q: Okay. Have you engaged in sex with Katrina while co-habitating in the same room with [the child]?

A: No, sir.

Q: Never have?

A: No, sir.

There is no evidence contradicting this testimony. As can be seen from the above-quoted excerpts, there are *hypothetical* questions posited by Mother's attorney that assume the contrary, but there is no *proof* that Father exposed the child to inappropriate behavior, nor is there any proof that the child "saw something he shouldn't have."

Regarding the child's alleged statement, "Katrina bite bite," Ms. Rose testified without objection that Mother had told her the child said it. But Mother did not so testify at trial, even when asked to "tell the Court what your concerns are in every respect." We have already quoted Mother's entire testimony regarding her concerns about the child's behavior. Simply stated, there is no evidence in the record that Father's unsupervised visitation would be harmful to the child. Consequently, we delete from the parenting plan the trial court's order requiring supervised visitation.

18

Father also challenges the provision in the permanent parenting plan that his "friend, Katrina, shall not spend the night with the Father when the minor child is present." The only finding made by the trial court in support of this provision was its observation that "I think that would prevent [the child] from seeing something or whatever that maybe he shouldn't see." Father testified that he and Katrina were living together in a rented house along with his and Katrina's child and her other three children. He said that the child has his own separate room where he stays during visitation times. Given these living arrangements, we must recognize that the restriction on Katrina staying overnight during Father's visitation time is a significant one. It requires the mother of four of the children living in the house to be somewhere else overnight.

There is almost no evidence in the record regarding Katrina, and none that suggests her presence would pose a risk of harm or detriment to the child. Under these circumstances, we delete from the parenting plan the provision forbidding Katrina to spend the night with Father when the child is present. *See Toyos v. Hammock*, No. W2011-01649-COA-R3-JV, 2013 WL 177417, at *36-37 (Tenn. Ct. App., filed Jan. 17, 2013) (vacating overnight "paramour provision" where trial court made no finding that allowing parent overnight visitation while a girlfriend was present "would jeopardize the child, in either a physical or moral sense") (internal quotation marks omitted); *Small v. Small*, No. M2009-00248-COA-R3-CV, 2010 WL 334637, at *19 (Tenn. Ct. App., filed Jan. 28, 2010) (finding "the trial court abused its discretion by imposing a restriction on Husband's visitation" where there was "no clear and definite evidence suggesting that contact with Husband's girlfriend would jeopardize the child's health or well-being"); *Barker v. Chandler*, No. W2010-01151-COA-R3-CV, 2010 WL 2593810, at *5-6 (Tenn. Ct. App., filed June 29, 2010) ("Finding the record completely devoid of any evidence demonstrating that the paramour provision is in the best interests of the children or that the presence of Mother's partner in the home has any harmful effect on the children, we find that the trial court abused its discretion").

Father argues that the trial court erred by including a provision in the parenting plan stating that "[t]here shall be no additional co-parenting time for holidays or otherwise, in that the Father shall be granted additional co-parenting time at such times as the Mother agrees." The colloquy at trial regarding vacation and holiday visitation for Father was as follows:

> FATHER'S ATTORNEY: So now we got to talk about visitation.
>
> THE COURT: Right now I'm going to leave it every other weekend.

19

FATHER'S ATTORNEY: So he's not going to get to see the child for Christmas.

MOTHER'S ATTORNEY: She's willing to work something out on that basis.

THE COURT: If she's willing to work something extra out on that, that's fine with the Court. We'll get to the base of that and I think she probably would be willing to work with him some. We'll leave that to the parties.

This approach might work fine, as long as the parties work together in a reasonable and cooperative fashion. If their working relationship sours, however, Mother is armed with a court order that grants her the power to deny Father from seeing the child on Christmas, birthdays, other holidays, and any additional vacation time. We agree with Father that the parenting plan should be crafted to entitle him to reasonable visitation time for holidays and vacations, without requiring Mother's consent. On remand, the trial court shall amend the permanent parenting plan so as to provide Father a fair share of parenting time on those special occasions.

Although Father asked that major decisions regarding the child, including those involving education, non-emergency health care, religious upbringing, and extracurricular activities, be made jointly between the parties, the trial court granted Mother sole decision-making authority. There is no evidence in the record supporting this decision, and the trial court made no findings of fact regarding why these decisions should not be made jointly. We hold that the parenting plan should be modified to allow major decisions regarding the child to be made jointly.

Finally, Father appeals the trial court's decision to award Mother attorney's fees in the amount of $5,000. The Supreme Court has provided the following guidance on the principles applicable to a decision to award a spouse attorney's fees in a divorce action:

> It is well-settled that an award of attorney's fees in a divorce case constitutes alimony in solido. The decision whether to award attorney's fees is within the sound discretion of the trial court. As with any alimony award, in deciding whether to award attorney's fees as alimony in solido, the trial court should consider the factors enumerated in Tennessee Code Annotated section 36-5-121(i). A spouse with adequate property and income is not entitled to an award of alimony to pay attorney's fees and expenses. ***Umstot v. Umstot***, 968

20

S.W.2d 819, 824 (Tenn. Ct. App. 1997). Such awards are appropriate only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses, *see Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992), or the spouse would be required to deplete his or her resources in order to pay them, *see Harwell v. Harwell*, 612 S.W.2d 182, 185 (Tenn. Ct. App. 1980). Thus, where the spouse seeking such an award has demonstrated that he or she is financially unable to procure counsel, and where the other spouse has the ability to pay, the court may properly grant an award of attorney's fees as alimony. *See id.* at 185.

*Gonsewski v. Gonsewski*, 350 S.W.3d 99, 113 (Tenn. 2011) (internal citations omitted).

The statutory factors that must be considered are as follows:

(i) In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability

21

or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i). In the present case, the trial court did not refer to this statute, or to any of the factors provided therein, in its final judgment of divorce. The divorce judgment states only, "[t]he Court finds that this is not an appropriate case for alimony and none is awarded," and "[t]he [Mother's] counsel is hereby awarded a judgment in the amount of $5,000.00 for attorney's fees for his representation of the [Mother] in this case."

In *Miller*, we stated that "[w]here the parenting arrangement on which the award of fees is based is reversed on appeal, it is seldom proper to affirm the award of attorney's fees." 336 S.W.3d at 586, citing *Placencia v. Placencia*, 3 S.W.3d 497, 504 (Tenn. Ct. App. 1999) and *Tarkington v. Tarkington*, No. M2002–01914–R3–CV, 2003 WL 22251339, at *4 (Tenn. Ct. App., filed Oct. 2, 2003). In this case, where there was no showing or finding that Mother lacks sufficient funds to pay her own legal expenses, or would be required to deplete her resources in order to pay them, no finding regarding Father's ability to pay, no alimony award, and Father was entirely successful on this appeal in challenging the parenting plan provisions at issue, we find it appropriate to reverse the award of attorney's fees to Mother.

V.

The provisions of the trial court's judgment and the incorporated permanent parenting plan are modified to deleted the provisions (1) requiring supervision of Father's visitation; (2) disallowing Father's girlfriend Katrina from spending overnight during visitation; (3) ruling that Father shall have no additional co-parenting time for holidays or otherwise without Mother's agreement; and (4) granting Mother sole authority to make major decisions regarding the child. The trial court is directed on remand to enter a revised parenting plan providing for joint decision-making on major decisions, and granting Father reasonable visitation for holidays and vacation times. The award of attorney's fees to Victoria Hope Mashburn is reversed. Costs on appeal are assessed to the appellee, Victoria Hope Mashburn.

_____
CHARLES D. SUSANO, JR., JUDGE