FILED

06/07/2017

Clerk of the
Appellate Courts



IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 13, 2016 Session

## SARAH NICHOLE NEVEAU v. ADAM PAUL NEVEAU

**Appeal from the General Sessions Court for Loudon County**
**No. 2013-DV-145   Rex Alan Dale, Judge**

_____

**No. E2015-02221-COA-R3-CV**

_____

This is an appeal from a divorce. The trial court granted the parties an absolute divorce and named the mother the primary residential parent of the parties' minor child. The father filed this appeal challenging the designation of the mother as the primary residential parent and questioning the number of days of parenting time he received in the parenting plan. We find that the evidence does not preponderate against the trial court's designation of the mother as the primary residential parent; however, the evidence does preponderate against the parenting plan that greatly limits the parenting time awarded to the father. Because we have concluded that the evidence preponderates against the parenting plan, we remand this issue to the trial court to adopt a plan that affords the father additional parenting time and to modify the child support award to comport with the new parenting plan. We also conclude that the tax exemption should be awarded to the father until such time as the mother becomes employed, at which time the issue can be revisited.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court Affirmed in Part and Reversed in Part; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

Sarah Richter Perky, Nashville, Tennessee, for the appellant, Adam Paul Neveau.

Carolyn Levy Gilliam, Knoxville, Tennessee, for the appellee, Sarah Nichole (Neveau) Comeaux.

# OPINION

## I. BACKGROUND

Adam Paul Neveau ("Father") moved to Loudon County, Tennessee from Palatine, Illinois in February 2010. He met Sarah Nichole Neveau ("Mother"), and the parties dated. Mother became pregnant in October 2010. Father denied that he was the father of the child throughout the pregnancy. However, despite Father's doubts, the parties were married on February 12, 2011, approximately five months before the birth of Anna ("the Child") on July 9, 2011. After Anna was born, Father acknowledged that she was his daughter.

Prior to and during the marriage, Father resided with Mother at the home of Barry and Penny Comeaux ("Maternal Grandparents") in Loudon County. Maternal Grandparents have a history of caring for foster children and have adopted three children. Mother was adopted by the Comeaux family when she was seven months old.

The record reveals that when the Child was born, Mother served as the primary caretaker. Mother fed Anna, bathed her, and took the Child to all of her medical appointments. During that period of time, Mother cared for the Child by herself because Father was at work or school and Maternal Grandparents were at work. Mother tried to attend a local community college a couple of days a week with Father caring for Anna, but Father showed little interest in interacting with the Child. Three days after Father started keeping the Child, Anna developed a horrible skin condition. At that point, it appears the parties agreed that Mother would be the stay-at-home parent. According to witnesses: "[Father] told us on more than one occasion that five minutes is all that the child needed from him a day." During his time in Tennessee, Father had little involvement with the Child.

Father had roughly seven different jobs in the first two years of Anna's life. Despite being employed, however, Father did not pay any rent to the Comeaux family. The trial court determined that Father "was not very successful in his employment efforts" and "[w]ent through many part-time jobs."

After the Child was first born, Mother was diagnosed with postpartum depression and was initially overwhelmed with caring for Anna. Mother testified that the situation was exacerbated by Father being verbally abusive:

> A. We did not get along. There was a lot of fighting. He would – he was emotionally and mentally abusive towards me.

Q. When you say that, what do you mean by emotionally abusive?

A. Call me names, tear me down, say I'm worthless. He would call me stupid, tell me I was not able to take care of my daughter. He – one of his favorite words that I can remember would be calling me a B.

Maternal Grandfather's testimony supported that of Mother: "I would hear the way that [Father] would talk to [Mother], and I – I would never even dream of talking to a woman that way, or anybody. He – he – he's an abusive person. . . . I can't even repeat a lot of the stuff that he would say, but, I mean, he would cuss at her, he would – he would, basically, belittle her any way that he could."

Allison Claudy, a babysitter, testified regarding Father's treatment of Mother:

A. The first day went well, and then there was a lot of arguing between [Father] and [Mother]. He yelled at her . . . incessantly. When I brought her to my house, his phone calls, you could hear him yelling at her over the phone, and I was – I was quite concerned. In fact, I called a friend at the Sheriff's Department and someone that volunteers with a child advocacy program and – and asked what steps would need to be taken if I felt that they were in danger and needed to have them in protective custody.

Q. What else caused you to want to seek authorities?

A. He just was constantly berating her. Also –

Q. When you say berating her, can you explain what that is?

A. It was as if nothing she could say or do was right in his eyes. Even if she was trying her best, you know, he was putting her down.

Q. Did [Mother] appear to be scared of him?

A. She said she wasn't, but I felt like she was.

Q. Were you scared of him?

A. A little.

- 3 -

The court found Ms. Claudy's testimony to be highly credible.

In May 2013, Father suggested a move to Illinois to live with his mother ("Paternal Grandmother"). Father contends that the parties mutually agreed to permanently relocate to Illinois. According to Mother, however, she agreed to try out living in Illinois. Mother discussed the reason she agreed to make the attempt: "Because I was trying to be supportive of, at the time . . . I was trying to be supportive as to him because he wanted to go up there, and I was trying to be considerate of what he wanted to do." In support of his claim that the move was to be permanent, Father asserts that he had secured a landscaping job in Illinois prior to the relocation. He notes that he had also scheduled interviews in Illinois for Information Technology positions, as he had received his associate's degree in December 2012. Once in Illinois, Mother and Father visited a preschool, Kindercare Learning Center, to discuss enrollment of Anna.

Upon reflection, Mother now argues that Father clearly planned to move her to Illinois in order that Illinois would become the home state of the Child for divorce purposes. She claims that Father first attempted to have her allow him and the Child to move to Illinois for a couple of months while she remained in Tennessee to pack:

> Q. Did the father suggest that he go up to Illinois for two months without you prior to agreeing that you would go up there?
>
> A. Yes.
>
> Q. And what happened to that idea?
>
> A. I told him that was not going to happen because at the time, from what I can remember, he wanted to take Anna up there, too. I said, no, you're not going up there without me.
>
> Q. Did it, at one point, get moved to three months that he was going to be up there for you to pack?
>
> A. Yes.
>
> Q. And you were not comfortable with that?
>
> A. No, I was not.
>
> Q. Why were you not comfortable with that idea?

- 4 -

A.  Because I wanted to be with my daughter.  I didn't find it right that he wanted to take her up there when, you know, I was down here by myself.  I wanted to be able to interact with her, take care of her, and I felt like being away from her that long was just too much.

After a few days in Illinois, Mother became unhappy with how Paternal Grandmother treated her.  Mother claims that the situation deteriorated after Paternal Grandmother slapped her.  Paternal Grandmother denies Mother's account and contends that Mother grabbed her arm while she was holding Anna.  Regardless of which version one believes, the result of the incident was that Mother decided to return to Tennessee with the Child.  Maternal Grandparents drove to Illinois, but Father obtained police assistance to deny Mother custody of Anna.  Subsequently, Father sought a temporary restraining order in an Illinois state court to retain custody of the Child.  In his petition, Father alleged, inter alia, that Mother had Asperger's Syndrome and a third grade level education.  On May 24, 2013, Father obtained an emergency order of protection vesting sole custody of the Child with him.

Five days later, on May 29, 2013, Mother filed for divorce in Loudon County.  The trial court determined that it had jurisdiction over the matter and ordered Anna returned to Tennessee with Mother as primary residential parent pending a hearing.  By the time the Child was returned to Tennessee, Mother had not seen her for six weeks, and Anna had become extremely upset and angry:

> Q.  [W]hat was Anna's state after being up in Illinois for six weeks with her dad?
>
> A.  She was pulling out her hair.  She came back scared to death of a vacuum she had played with for the longest time.  She was scared.  She would scream every time we turned it on like it was going to hurt her or something.  She was always pulling at her hair when she would get upset.  It seemed like she was just – didn't know how to handle anything anymore.  She was emotionally – you could tell she was an emotionally messed up child when she had come back.  She was very angry.  She had a lot of anger.
>
> Q.  Had she ever pulled out her hair before staying in Illinois?
>
> A.  No, she did not.
>
> Q.  Had she ever been an angry child before then?

A. No, she was always a very happy child.

On July 17, 2013, the trial court awarded the parties equal parenting time. Father received two weeks of visitation every month.

After the parties separated, Father remained in Illinois and continued to live with Paternal Grandmother. According to Mother, Father had previously described his relationship with his mother as follows: "He said that – he would call her . . . the devil. I – he would tell me all the time that he hated her, wanted nothing to do with her, and that he  -- he just despised her, pretty much. He wanted nothing to do with her whatsoever." Maternal Grandmother discussed an incident when Paternal Grandmother kicked the parties and Anna out of her home during a visit:

> A. . . . [T]hey were left at the airport. They were thrown out of his – of his mother's house.
>
> Q. They were left at an airport?
>
> A. They were left – they were left at the airport. They were there for, if I recall, about eleven hours with no food to eat. His – his mom had told him for – this is – was his own words, to get the F out of my house, and they were . . . I believe his friend, Steve, had to bring them back to the airport, and they sat there and had to call me to get a credit card number because they had no money, no food, no food for Anna, was sitting there at the airport . . . .

Paternal Grandmother painted a different picture of her relationship with the couple and testified that Mother complained to her about living with Maternal Grandparents:

> Q. Did Nichole describe to you . . . what her relationship was like with her parents?
>
> A. She said that her parents control her and tell her what to do all the time and she can't wait to get out of there and that her mom's trying to take Anna away from her, that her mom wants to be her mother, and her mom does everything and she doesn't get to do anything, and . . . her mom and dad don't love her, they only love Anna and they only take care of Anna.
>
> Q. And that's what Nichole told you?

- 6 -

A.  That's what Nichole told me.

According to Father and Paternal Grandmother, since the separation, when the Child was in Illinois, she was involved in nurturing activities.  She attending scout meetings with Paternal Grandmother, who also enjoys teaching the Child to bake.  Father further noted that he enrolled Anna in ballet classes.

After the parties began to share custody of Anna, Mother claims that Father was stubborn about working together with her on parenting issues.  For example, just before the trial, Mother, in an attempt to improve the Child's car trip comfort, suggested that the parties meet each other halfway.  In order to not cooperate, Father lied that he worked weekends.  Father further demanded a police escort at every transfer of the Child until the summer before the hearing.  Another incident occurred when Father failed to notify Mother that Anna's Illinois daycare had 15 children with measles despite the fact that Mother had a newborn baby at home.  As to the last matter, Father contends that when he tried to call Mother, she hung up on him and then turned off her phone when he attempted to call back.  Father claims that he acknowledged the Child needed Mother and her little brother in her life; Mother, however, consistently refused to communicate with him, while Maternal Grandparents monitored calls and interfered with his court-ordered telephone contact with the Child.

During the pendency of the divorce proceedings, Mother became impregnated by another man.  Additionally, Maternal Grandfather was arrested for soliciting prostitution within 100 feet of a school or church.[1]  Father further testified regarding an occasion in October 2014 when Mother went out dancing and drinking at a club while Maternal Grandparents cared for the Child.  On the day of the incident, Anna had been ill with a fever; she eventually was taken to a hospital.  Father contends that when he learned of the Child's trip to the hospital, Mother would not take his calls.  To get information, he drove to Knoxville from Illinois to check on the status of his daughter.  Mother argues that she did not call him because her cell phone battery had died.

The trial took place on May 12, 2014, and March 2, 2015.  On October 21, 2015, the court granted the parties an absolute divorce.  At the time the divorce was awarded, Father was 27 and Mother was 22. After reviewing the factors in Tennessee Code Annotated section 36-6-106, the court found that Mother should be the primary residential parent, as ten factors favored Mother compared to four for Father. "Considering the distance between the parties," visitation was "based upon Lenoir City School's Calendar." On September 1, 2016, Mother was awarded 299 days of co-

---

[1]Father asserts that Mother told him that she recalled Maternal Grandfather getting in bed with her when she was a child and raping her.  At trial, she testified that she could not remember if it was reality or a dream.

parenting time with Anna in Tennessee; Father was given 66 days[2] and ordered to pay $458 of child support per month. Father agreed to pay an additional $75 per month to address his total arrearage of $2,498. Father filed a timely appeal.

## II. ISSUES

We restate the issues raised by Father in this appeal as follows:

> 1. Whether the trial court failed to properly weigh the factors set forth in Tennessee Code Annotated section 36-6-106(a)?
>
> 2. Whether the trial court erred in awarding Mother sole major decision-making authority for the Child in the areas of education and extracurricular activities?
>
> 3. Whether the trial court erred in awarding Mother the dependent exemption for the Child in alternating years since it provided no financial benefit to her?

## III. STANDARD OF REVIEW

We review the trial court's findings of fact de novo on the record, presuming those findings to be correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002). When the trial court's factual determinations are based on its assessment of witness credibility, we will not reevaluate that assessment absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). A trial court's conclusions of law are reviewed de novo with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

In custody, visitation, and residential placement determinations, the welfare and best interest of a child are the paramount concern. The goal is to place the child in an environment that will best serve the child's needs. Tenn. Code Ann. §§ 36-6-106(a) and 36-6-404; *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001); *Parker v. Parker*, 986 S.W.2d 557, 562 (Tenn. 1999). The General Assembly has determined that "[t]he best interests of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care." Tenn. Code Ann. § 36-6-401(a).

---

[2]Father's parenting time was reduced down from 182.5 days per year.

Trial courts have broad discretion in devising permanent parenting plans and designating the primary residential parent, but those determinations must be made based on proof and applicable principles of law. *Chaffin v. Ellis*, 211 S.W.3d 264, 286 (Tenn. Ct. App. 2006); *Parker*, 986 S.W. 2d at 563. Such decisions must turn on the particular facts of each case. *Nelson v. Nelson*, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001). "It is not the function of appellate courts to tweak a [residential parenting plan] in the hopes of achieving a more reasonable result than the trial court." *Eldridge*, 42 S.W.3d at 88. Because of the trial court's broad discretion, appellate courts are reluctant to second-guess a trial court's determination regarding parenting plans. *Nelson*, 66 S.W.3d at 901. Decisions regarding such plans often hinge on subtle factors, such as the parents' demeanor and credibility during the proceedings. *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). A court also is said to abuse its discretion "when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Armbrister v. Armbrister*, 414 S.W.3d 685, 692-93 (Tenn. 2013) (quoting *Eldridge*, 42 S.W.3d at 88). *See Webb v. Webb*, No M2012-02438-COA-R3-CV, 2013 WL 6706855, at *2 (Tenn. Ct. App. Dec. 17, 2013).

## IV.  DISCUSSION

### A.

Father argues that the court improperly weighed the Tennessee Code Annotated section 36-6-106(a) factors in designating Mother as primary residential parent. The following statutory factors are considered in making custody and visitation determinations on the basis of the best interest of a child:

> (1)  The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

> (2)  Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining

- 9 -

the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

* * *

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. . . .

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. . . .

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

- 10 -

(14)  Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15)  Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a).  As we noted in *Port v. Hatton*, No. M2011-01580-COA-R3-CV, 2013 WL 865549 (Tenn. Ct. App. Mar. 6, 2013), "[w]hile the trial court is directed to consider the appropriate factors in reaching its decision, it is not required to list each factor with the court's conclusion about how that factor impacted the custody decision." *Id.* at *6 (internal citations omitted).

The General Assembly has directed that every divorce judgment "involving a minor child shall incorporate a permanent parenting plan."  Tenn. Code Ann. § 36-6-404(a).  In *Rountree v. Rountree*, 369 S.W.3d 122, 129 (Tenn. Ct. App. 2012), this court stated:

> In fashioning parenting plans, Tennessee Code Annotated section 36-6-401 advises courts that:
>
> The [G]eneral [A]ssembly recognizes the fundamental importance of the parent-child relationship to the welfare of the child, and the relationship between the child and each parent should be fostered unless inconsistent with the child's best interests.  The best interests of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care.
>
> * * *
>
> Most children do best when they receive the emotional and financial support of both parents.

Tennessee Code Annotated section 36-6-106(a) provides in pertinent part:

> In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in subdivisions (a)(1) – (10), the location of the residences of the parents, the child's need for stability and all other relevant factors.

In determining which parenting arrangement was in the best interest of Anna, the trial court engaged in a "comparative fitness analysis." *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996). The court made the following findings of fact pursuant to Tennessee Code Annotated section 36-6-106(a):

> Mother is positive on the past performance of the parenting responsibilities; Mother, in the past, has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities; the love affection, and emotional ties existing between each parent and the Child is in favor of Mother; the Child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors is in favor of Mother; the importance of continuity on the Child's life and the length of time the Child has lived in a stable, satisfactory environment is in favor of Mother; evidence of physical or emotional abuse to the other parent is in favor of Mother, because of the verbal berating that Father has done; the parents' employment schedule is in favor of Mother; Father's decision to relocate to Illinois weighs in favor of Mother.

The court found the following factors in favor of Father:

> The parental moral fitness is in favor of Father due to Mother having a child by another man who is still married at the current time, which is not a good example for the Child to see; the mental fitness is in favor of Father due to Mother having a slight learning disability; the Child's involvement with her physical surroundings, school, or other significant activities is in favor of Father; the character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the Child is in favor of Father due to the pending charges against Maternal Grandfather and the other issues that have been addressed with Maternal Grandfather.

The court also made the following findings regarding the credibility of each testifying witness:

> a. Maternal Grandmother was consistent in her parenting testimony and was credible and fair to both Mother and Father in it. Maternal Grandfather's testimony did line up to

some extent with Maternal Grandmother's testimony, but the court found Maternal Grandmother to be more credible.

b.  Maternal Grandfather's testimony was reasonably biased in favor of his daughter.  He's protective and prone to some exaggeration, and the court does not find his testimony as credible as that of Maternal Grandmother.

c.  Child's babysitter in Tennessee.  Allison Claudy's testimony was highly credible although she had limited contact with the Child.  Her testimony was consistent with Maternal Grandparents' testimony as far as the problems that had evolved between Mother and Father.

d.  Maternal Great-Aunt, Patti Peltier's testimony was very credible on what she did observe during her limited contact on family gatherings and major holidays.  Her testimony was also consistent with Maternal Grandmother about the parenting and lack of parenting between Father and Mother.

e.  Mother's testimony was credible.

f.  Paternal Grandmother, Lisa Gullo.  Her testimony was reasonably biased in favor of Father and prone to exaggeration.  There's a lot of her testimony where she testified that she's never seen Father be inappropriate to Mother and that Father never smoked around the Child, that she never saw Father yell, never heard him yell, that he has always been one that has never gotten overly excitable.  Blanket testimony such as that, using all-inclusive words like never or always raises a red flag to the court.

g.  Father's testimony was credible but not as credible as Mother's testimony.

h.  Daycare Provider in Illinois, Susan Brown.  Her testimony by deposition was found to be credible but limited as to scope because of her limited access.  She only saw Mother one time while the Child was in KinderCare in Illinois.

With regard to the strength, nature, and stability of the child's relationship with each parent, the trial court found that Mother performed the lion's share of the past primary child care and parenting responsibilities of Anna.  As described by the trial court:

- 13 -

"I think even the father recognized that and agreed that for the past performance of the parenting responsibilities, the mother did the lion's share while he was going to school and employed and staying at the maternal grandparents' home." Father contends that Mother only served as the primary caregiver for the first year and ten months of Anna's life, whereas the parties have equally served in that capacity since. Although Father did begin receiving half of the visitation with the Child, the court properly concluded that his lack of interaction with the Child during the first two years of her life impacted their relationship. It was appropriate for the court to find in favor of Mother on this factor.

Father asserts that the court should have found the factor of willingness to facilitate and encourage a close and continuing parent-child relationship between the Child and both parents weighed more heavily in his favor. The court concluded that Mother and Father equally failed at facilitating and encouraging a close and continuing parent-child relationship between the Child and both of the parents, consistent with the best interest of the Child. The court specifically stated: "I still think the father and the mother have a long way to go on that. So I've got a negative on each one of the parents as to that issue." We find no abuse of discretion by the trial court in this determination.

Father contends that he is better able to financially provide for the Child, promote her involvement in enrichment activities, and insure her education and care without the day-to-day assistance of family. He notes that Mother is completely dependent on Maternal Grandparents for the Child's basic necessities outside of government assistance. Father observes that Mother does not have a driver's license and is unable to drive the Child to the doctor or parenting exchanges. He claims that Mother is unable to provide for the Child because she does not work outside the home. Father contends Mother's learning disability affects her ability to properly care for the Child.

According to Mother, Father is the one who initially wanted her to stay home. She notes that Father is "still undergoing some problems with keeping a job." Indeed, at the time of the final hearing, Father was working part-time at a restaurant and no longer providing insurance for the Child as required by court order. Based upon Father's inability to continue to keep a full-time job, as well as the mutually made decision by the parties that Mother stay at home with Anna, we find no error in the trial court's conclusion that the parties are equally able to provide for food, medical care, clothing, education and other necessary care for the Child.

Father further contends that the court should have found that the love, affection, and emotional ties existing between each parent and the Child weighed equally between the parties. Father asserts that Mother's family has limited knowledge of the bond he has developed with the Child since he left Tennessee and the current affection he shares with Anna.

At the trial, Maternal Grandmother described Father's pickups of the Child as follows:

> A. He comes to the door, he picks her up, he walks down the sidewalk, he puts her in the car, and they drive off.
>
> Q. How does the child react?
>
> A. She's not crying, but she's not excited. I mean, she'll go to him.

In contrast, Maternal Grandmother described Mother's pickups of the Child:

> Q. What is the interaction like when the mother picks the child up in Illinois?
>
> A. When they open the door, Anna is jumping up and down. Before they open the door, she's in the window waving at us, jumping up and down, screaming Mommy, Mommy, Peppy, Pop-Pop and is very excited. We hug her and we kiss her, and – and we – we spend a few minutes in the car getting her settled down, getting her – her favorite stuffed animal. She always asks where her little Mo-Mo is, which is a monkey.

Mother additionally related the Child's demeanor on phone calls:

> Q. How do phone calls go between the parent that doesn't have custody and the child?
>
> A. Anna will not talk to him. She refuses. She gets upset. She screams. She says, no, I don't want to talk to him. She starts getting aggressive towards me and my mom because she just does not want anything to do with him.
>
> Q. So what does she do? Does she ever hang up on the phone?
>
> A. Yes, there's been multiple times where she's hung up on him.
>
> Q. Does she talk to her dad a good bit when he's here?

- 15 -

A.  Occasionally, but very rarely.  No, she wants nothing to do with him.

Q.  And what about the phone calls from you to her when she's in Illinois?

A.  She seems very happy.  I mean, she doesn't talk long, but, you know, the age she's at she's not going to hold a long conversation, but she—she does interact with me quite a bit. She wants to talk to her brother constantly.  She—she'll ask me can I talk to brother or I'll ask her. You know, she'll want to talk to me, she'll want to talk to Peppy and Pop-Pop and she seems to just want to talk to me and tell me about everything that's going on up there.

Q.  Does she ask when you're coming to get her?

A.  Yes, she does every single time we talk to her.

This testimony supports the court's finding: "As far as the affection between the child and the parent, I find that in favor of the mother, as well as the emotional ties, I find that in favor of the mother.  I find that the father has made a marked improvement, and he is a lot better in those areas.  But the mother and the child affection has been displayed way more heavily in her favor."  The record supports the trial court's decision finding in favor of Mother on this factor.

In addressing the Child's interaction with family members and surroundings, the court found that it was more important for Anna to spend greater time with her brother as well as Maternal Grandparents than in Father's home where he has experienced a past rocky relationship with Paternal Grandmother.  The court considered all of the relatives in each home and determined that Mother's home was favorable, particularly due to the importance for siblings to grow up together.  Courts in this state have regularly recognized that a parenting plan that separates siblings is discouraged. *See Rice v. Rice*, 983 S.W.2d 680, 684 (Tenn. Ct. App. 1998).  Maternal Grandmother discussed Anna's bond to her brother:

Oh, my goodness, they're – they love each other.  It's been – we talk to Anna on the phone, and she'll talk to Jacob.  He'll just smile and – and . . . talk to her.  You know, he'll – he'll coo when he hears her voice, and she loves to help change the diaper and – and hold him, and she'll hold the bottle when we're feeding . . . him.  She adores him.

- 16 -

Mother further described Anna's love for her brother: "She – they love each other. They have a very close bond. They interact. He is all smiles and giggles when she's around, and she is constantly on top of him making sure he's okay."

Father argues that Maternal Grandfather's bathing with Anna was inappropriate, although he never complained about the activity when he lived in the home. Further, despite now arguing that Paternal Grandmother is a positive influence on the Child, the record reveals that Father previously referred to her as "the devil." Mother testified that Father "would tell me all the time that he hated his mother, wanted nothing to do with her, and that he – he just despised her, pretty much. He wanted nothing to do with her whatsoever." Father's contentions do not give rise to an abuse of the trial court's discretion.

In considering the factor of continuity, the court reasonably found in favor of Mother, as the Child's current home is where Anna spent her first two years of life, as well as where Mother has lived for the last seventeen years. Father, on the other hand, has lived with different people for many years without paying rent. During the relevant time frame, Father has lived at his biological father's house, Mother's sister's apartment, Maternal Grandparents' home, and Paternal Grandmother's home, where he is currently residing. Father is dependent on Paternal Grandmother for housing, a concerning fact considering his past contentious relationship with his mother. Due to Mother's stable and constant housing before and after Anna's birth versus Father's continued moves, as well as his unstable housing with Paternal Grandmother, it was appropriate that the trial court found as follows: "The mother has had a stable place. The mother has created a stable environment. [Anna]'s been with her grandparents there. The father has not. He has moved in and out of places. He's had multiple jobs. He's just unable to create that stability." The court's finding in favor of Mother was appropriate.

Out of an abundance of caution due to the questions raised concerning Maternal Grandfather bathing with the Child, Anna was sent to the Child Advocacy Center and she underwent an examination by Dr. Mona Hayes. No proof was found that the Child has been abused, but the court issued restrictions on Maternal Grandfather's visitation as a precaution. Accordingly, the court properly concluded that the factor of abuse towards the Child did not come into play in the visitation determination

Father admitted that both parties raised their voices during arguments. He claims, however, that he did not call Mother a "B" or "stupid"; instead, he accused her of "being stupid" when she would exhibit poor judgment. Father notes that there is no proof that these arguments took place in the presence of the Child. He further stresses that the behavior occurred two years before the final hearing. However, based upon the babysitter's testimony alone, the trial court properly found that Father had been verbally abusive toward Mother. Additionally, Mother's family all testified that Father yelled at

Mother during the marriage. The court's finding does not rise to the level of an abuse of discretion.

Father argues that the trial court credited Mother for acting as a stay-at-home parent when the proof revealed that Mother was home because she was unwilling to maintain gainful employment. He contends that Mother's alleged occupation as a stay-at-home mother is only a guise for her voluntary unemployment. The record before us reveals that Mother testified Father "wanted me to stay at home with Anna and raise her." Additionally, Maternal Grandmother testified: "When Adam was there, he didn't want her to [work]. They agreed that she would stay at home and take care of the - the child." In contrast, the evidence is uncontested Father could not hold down a job while in Tennessee. Although he did keep a job for approximately a year in Illinois, at the conclusion of the trial he was no longer employed by that company and was only working part time at a restaurant. Additionally, Father was in contempt of court for not notifying Mother that he was no longer insuring the Child after leaving his last employer. Based upon the evidence, the court did not abuse its discretion in determining that Mother has a more stable employment history then Father. The court appropriately found that the parties' joint decision for Mother to stay at home with the Child was a consistent full time job versus Father who has a continued path of not maintaining positions.

The court found another relevant factor weighing against Father was his choosing to move to Illinois, which is ten to twelve hours away from Mother and the Child. According to Mother, the initial plan of the parties was to go to Illinois and assess the opportunities. According to Mother, "We were under the understanding that I'd give it a few days, and then if it didn't work out we would move back down here." To the contrary, Father claims that Mother had agreed to permanently relocate. Based upon the record, the court concluded that it was Father's decision to move out of the state of Tennessee. We find no abuse of discretion.

In summary, the trial court conducted a proper best interest analysis in this case. We find that the evidence does not preponderate against the trial court's weighing of the relevant factors and the designation of Mother as the primary residential parent of the parties' child. We affirm the trial court's decision in this regard.

**B.**

Father next challenges the parenting plan adopted by the trial court. Tennessee Code Annotated section 36-6-106(a) provides that, taking into account a child's best interest, the trial court shall adopt a parenting plan that permits each parent to enjoy the maximum participation possible in the child's life that is consistent with the factors set forth in the statute. *See Strickland v. Strickland*, No. M2012-00603-COA-R3-CV, 2012 WL 6697296, at \*10 (Tenn. Ct. App. Dec. 21, 2012); *see Rountree,* 369 S.W.3d at 129. The relationship between the child and each parent should be fostered because of the

- 18 -

fundamental importance of the parent-child relationship to the welfare of the child. Tenn. Code Ann. § 36-6-106(a). The location of the parents' residences, the child's need for stability, and all other relevant factors must be considered. *Id.*; Tenn. Code Ann. §36-6-401(a).

Father asserts that affording him only 66 days of co-parenting time failed to maximize his participation in Anna's life. He argues that he should be allowed co-parenting time during every spring break and fall break, every long holiday weekend such as Presidents' Day, Martin Luther King Day, and in-service days. He also seeks every Easter and Thanksgiving break, the entirety of Christmas break, and the whole summer break. This requested schedule would increase Father's parenting time to approximately 137 days.

Mother contends that the schedule proposed by Father would allow her little downtime with the Child. She further asserts that Anna would have little time for extracurricular activities in Tennessee. She relies upon our discussion in *Goddard v. Goddard,* No. E2011-00777-COA-R3-CV, 2012 WL 601183 (Tenn. Ct. App. Feb. 24, 2012): "[T]he best interests of the child are fundamentally interrelated with the best interests of the custodial parent. Similarly, we think that the best interests of the child are also fundamentally interrelated with the best interests of the parent with whom the child spends the majority of his or her time." *Id.* at \*9 (internal citations omitted).

We find that the evidence preponderates against a parenting plan that limits Father's parenting time to only 66 days a year. The prior period of equal parenting time allowed Anna to develop a closer relationship with her Father and Paternal Grandmother. During that period, the Child also engaged in extracurricular activities in Illinois, such as sports, Girl Scouts, and dance, which Father and Paternal Grandmother described as an important part of the Child's life. We conclude that the evidence preponderates in favor of a parenting plan that does not so greatly minimize the parenting time of Father. Accordingly, we reverse the determination concerning the parenting plan and remand that issue for the trial court to adopt a plan that increases Father's time with the Child. Once the trial court has approved a revised parenting plan, the court shall also modify the child support.

## II.

Father argues that the trial court erred in awarding Mother sole major decision-making authority for the Child in the areas of education and extracurricular activities.

The testimony at trial revealed an acrimonious relationship between Mother and Father. The record as a whole showed that the parties rarely could agree on anything, especially in the areas of education. While each parent engaged in educational and

extracurricular decision-making for the Child during their respective parenting periods, the evidence reveals their inability to make decisions together. As stated by the trial court, "I've seen improvement vastly from both sides on – I think the biggest problem that the parents have together right now that remains is not on parenting but it's on co-parenting. . . . The co-parenting issue is involving the other parent in the co-parenting decisions that you make and the co-parenting issues that are raised by the child."

In allocating decision-making authority, the trial court is statutorily required to consider:

> (1) The existence of a limitation under § 36-6-406;
>
> (2) The history of participation of each parent in decision making in each of the following areas: physical care, emotional stability, intellectual and moral development, health, education, extracurricular activities, and religion; and whether each parent attended a court ordered parent education seminar;
>
> (3) Whether the parents have demonstrated <u>the ability and desire to cooperate with one another in decision making</u> regarding the child in each of the following areas: physical care, emotional stability, intellectual and moral development, health, education extracurricular activities, and religion; and
>
> (4) The parents' <u>geographic proximity to one another</u>, to the extent that it affects their ability to make timely mutual decisions.

Tenn. Code Ann. §36-6-407(c)(1)-(4) (emphasis added). According to Tennessee courts: "The child's best interests will be served if these decisions can be made without undue delay and stress." *See Coley v. Coley*, No. M2007-00655-COA-R3-CV, 2008 WL 5206297, at *7 (Tenn. Ct. App. Dec. 12, 2008). The parties in this matter have shown that they are unable to make decisions jointly without undue delay and stress, and as such one parent should be responsible for making these important decisions. Each motion filed causes undue delay and stress for the Child, which is not in Anna's best interest. *See Webb*, 2013 WL 6706855 at *2. In such situations "where the parents are unable to agree on matters of great importance to the welfare of their minor children, the primary decision-making authority must be placed in one parent or the other." *Id.* Here, Mother is "the primary residential parent, so she appropriately holds the authority to make major decisions for the child." *Id.*

The evidence before us shows the inability of the parties to make joint decisions. This fact, along with the extensive distance between the parties and Mother's designation as the primary residential parent, supports our affirmance of the trial court's determination naming Mother the sole decision-maker for the areas of education and extracurricular activities at this time. The evidence does not preponderate against the trial court's decision to make Mother the primary decision-maker regarding the Child.

## III.

Father states that it is undisputed that Mother is not gainfully employed and has no taxable income. He contends that the financial benefit to him in claiming the Child as a dependent is significantly greater than the financial benefit to Mother.

The Tennessee Child Support Guidelines, Tenn. Comp. R. & Regs. 1240-2-4-.03(6)(b)(2)(ii), provide an assumption that the primary residential parent should claim the tax exemption for the child. However, this decision is discretionary. Such decision rests on the facts of the particular case. *Farmer v. Stark*, No. M2007-01482-COA-R3-CV, 2008 WL 836092, at *9 (Tenn. Ct. App. Mar. 27, 2008). In light of Mother's negligible income, the exemption is of no use to Mother at this time. Under the facts of this case, where Father stands to gain greater benefit from the exemption, we find that the exemption should be awarded to Father until such time as Mother, the primary residential parent, gains employment.

## V.  CONCLUSION

The decision of the trial court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. Costs of the appeal are assessed against the parties equally.

_____
JOHN W. MCCLARTY, JUDGE